# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## Schriber *against* Rapp.

An association by which each surrendered his property into one common stock for the mutual benefit of all, during their joint lives, with the right of survivorship, reserving to each the privilege to secede at any time during his life, is not prohibited by law. And that right of secession is not transmissible to the personal representative of a party to such agreement, so as to enable him to recover the property of his intestate, so put into the common stock.

A member of a religious society cannot avoid a contract with it on the basis of its peculiar faith, by setting up the supposed extravagance of its doctrines as proof that he was entrapped.

ERROR to the common pleas of *Beaver* county.

This was an action of account render by Jacob Schriber, administrator of Peter Schriber, deceased, against George Rapp, R. L. Baker, Frederick Eckensberger, John Schriber, Lewis Schriber, Adam Schriber, and Daniel Schriber, doing business in company, under the name of the Harmony Society.

The plaintiff and defendants were members of an association called the "Harmony Society," which existed, first, at Harmony, in Beaver county, Pennsylvania; next, at Harmony, on the Wabash, in the state of Indiana; and lastly, at Economy, in Beaver county.

To sustain the action, the plaintiff proved by the testimony of

Dr Smith, once a member of the association, that the said Peter Schriber joined the society in the year 1806, and had at that time (as Mr Rapp told him) 1000 acres of land, in the state of Ohio, together with a large amount of personal property, viz: six or eight head of horses, ten head of cattle, a great number of hogs, two wagons, and other property.  After Schriber had been in the society some time, there was an application to buy the land, and Rapp told the witness that Schriber had sold the same for 4 dollars and 50 cents to 5 dollars per acre.  Schriber and his wife came with the money in their saddle bags, and the money, was there taken out. Witness heard George Rapp say, that Schriber had brought 8000 dollars in money.  It was Schriber and Neff's money that enabled them to start manufactories and merchandise.  At Harmony, they had about 7000 acres of land, 1000 cleared; worth 5 dollars per acre; cultivated it ten years.  On the Wabash they owned 30,000 acres—2000 acres cleared; lived there about ten years—worth 5 dollars per acre.  Rapp told witness, at Economy, they had about 4000 acres, not far from 2500 acres cleared.  At Harmony there was a woollen factory, two grist mills, oil mill, saw mill, two distilleries, brewery, store, and tavern; 50,000 dollars a year profit arising from the whole, first and second year statements were made, but as soon as we began to make money it was quiet.  On the Wabash we had steam grist mill, woollen and cotton factories, oil mill, two saw mills, two distilleries, brewery, one store, tavern, grist mill.  After paying all expenses, 50,000 dollars a year would not be too high an estimate of our profits.

At Economy we had steam grist mill, oil mill, saw mill, woollen and cotton factories, distillery, brewery, store, tavern, &c.  Profits of all worth 75,000 dollars a year.  It was a community of property, a kind of patriarchal government, and apostles, as the articles of agreement states.  They intended to make money when they entered into it; it was a part of their object.  I believe there were articles at Harmony, but every one was not obliged to sign it. Equal rights, equal enjoyments, and equal profits.  Poor men were to enjoy the same privilege as the rich, and whenever a division took place, of course the wealthy man would get more than the one who had no property.  Rapp said, that for instance, if any of the people should become dissatisfied and wanted to withdraw, they should be provided according to their merits, and the property their parents had put in.  Rapp said it should not be incorporated for that would take too much power from him.  Rapp was not elected. He assumed the power that Moses and Aaron had.  If any one would not do as he said, he would say, " What have you to do about it, I have the power—I could crush you.  All you have to do is to obey."  He got worse as he got wealthy.  In 1833, property worth between 300,000 and 1,000,000 of dollars.  Witness entered the society at fifteen or sixteen years of age, in 1805, at Harmony. George Rapp was then a preacher.  George and Frederick Rapp

superintended the temporal affairs of the society. When Peter Schriber entered he was a man of 40 years, and had a wife and eight or nine children. Jacob was 17 or 18 years old. Three of them are in the society yet; the old man and woman are dead. Lewis, John and a sister were older than Jacob. He continued in the society until his death in June 1833.

Jacob Waggoner, among other things, testified, that the profits of the woollen factory in one year were 45,000 dollars; of the cotton factory 15,000 or 20,000 dollars. Profits of the distillery 10 dollars per diem. Clear profits of the whole estate not less than 100,000 dollars per annum.

Jacob Bentel testified, that the profits of the establishment, (exclusively of stocks) was from 90,000 to 100,000 dollars, annually.

Defendants, to sustain the issue on their part, produced in evidence the articles of association, dated 20th January 1821, also articles of association, dated 9th March 1827., Deed from Schriber, *prout*, dated the 26th of August 1826, and recorded the 13th of June 1833.

Adam Shelly testified, on behalf of the plaintiff respecting the first articles of association on the Wabash. The people were directed to come in companies, one of them read it and the rest signed it. Some said they thought it was not right; others said father Rapp would not do wrong. A member of the society had left them a little before and brought a suit; this was the reason of their signing. It would make the property more sure in Rapp's hands. As to the articles signed at Economy, Rapp made a long speech. Said any one who would sign it, would have his name written in the Lamb's Book of Life. If they did not their names would be blotted out and God would ask him about it. The members were induced to sign the articles in consequence of what Rapp said.

Dr Smith, recalled, stated, that after Jacob Schriber left the society, it was rumoured that he intended to bring a suit; that he heard Mr Rapp tell some person to bring Mr Schriber to him, and witness went into George Rapp's room and saw him, Frederick Rapp, and Peter Schriber. Saw him give the old man fruit; and heard him say to him, "Now you may go home; he cannot get at any thing." This was about Schriber's deed for the property.

Witness further testified, that every time there were any papers to be signed Rapp prepared their minds for it a long time before. He made them believe their names would be recorded in the Book of Life, if they would sign it. He more than once said it would be an unjust God that would bring them to happiness without asking him. The doctrines he preached had an effect on Peter Schriber. He once heard Peter Schriber say, it would be only two years and a half till the Lord would come. I told him nobody knew it. He replied, Why yes! Did you not hear Father Rapp saying so. He then said, you have got far astray if you doubt Father Rapp's words. He said, he was sure he would live to see

the Lord in person. He was skilful as a mechanic, but a very weak minded man. For seven years before his death, he had not capacity for business.

Philip Bentil testified, that he never heard of the deed while he lived at Economy. When they wished them to sign, George Rapp always made a long speech about it, that if they would sign, their names should be written in the Lamb's Book of Life. If they did not, their names would be stricken out, and they would go to Hell; they would get nothing. At the time the articles were signed, he coaxed them very much. When I signed, he told me so sure as I signed, my name would be in the Lamb's Book of Life. Peter Schriber, as he got old became superstitious, and Rapp could do any thing with him.

The following deeds were given in evidence, by the defendants.

Deed—Peter Schriber to George Rapp.

Know all men by these presents, that I, Peter Schriber, of the town of Economy, in New Sewickly township, Beaver county, and state of Pennsylvania, as well for and in consideration of the maintenance which I have, for several years past, received from George Rapp and his associates, known by the name and style of the Harmony Society, as also, for and in consideration of my future support and maintenance, for and during my natural life and the further sum of five dollars to me in hand paid by the said society, the receipt whereof is hereby acknowledged, have given, granted, bargained and sold, and by these presents do give, grant, bargain, and sell unto the said George Rapp and his associates, all the property, real, personal, and mixed, which I brought with me when I became a member of said society or at any time since may have put into their possession or keeping. To have and to hold to the said George Rapp and associates and their successors for ever, and further, I do hereby, for myself and my heirs, remise, release, and quit claim, and for ever discharge the said George Rapp and his associates, and each and every of them of and from all manner of actions, causes of actions, suits, debts, dues or sum of money, account, reckonings, damages, claim or demand whatsoever which, against the said George Rapp and his associates, and each and every of them I ever had, now have, or which I, my heirs, executors, or administrators hereafter shall or may have, for or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day of the date of these presents.

In witness whereof, I have hereunto set my hand and seal the 26th day of August 1826.

PETER SCHRIBER, [L. S.]

Signed, sealed, and delivered in the presence of

JOHN STEVENSON,<br>PAUL ANDERSON.

Beaver county, ss.—Before me, James Logan, a justice of the peace in and for the said county, personally came the within named

Peter Schriber and acknowledged the within indenture to be his act and deed and desired that the same might be recorded as such.

In testimony whereof, I have hereunto set my hand and seal, the fifth day of September A. D. 1826.

JAMES LOGAN, [L. S.]

(Copy of the articles of association, executed at Economy.)

Whereas, by the favour of Divine Providence, an association or community, has been formed by George Rapp and many others, upon the basis of Christian fellowship, the principles of which being faithfully derived from the sacred scriptures, include the government of the patriarchal age, united to the community of property adopted in the days of the apostles, and wherein the single object sought is to approximate, so far as human imperfection may allow, to the fulfilment of the will of God, by the exercise of those affections, and the practice of those virtues which are essential to the happiness of man in time and throughout eternity.

And whereas, it is necessary to the good order and well being of said association, that the condition of membership should be clearly understood, and that the rights, privileges, and duties of every individual therein, should be so defined as to prevent mistake or disappointment on the one hand and contention or disagreement on the other.

Therefore, be it known to all whom it may concern, that we, the undersigned, citizens of Beaver county, in the commonwealth of Pennsylvania, do severally and distinctly, each for himself, covenant, grant, and agree to and with the said George Rapp and his associates, as follows, to wit:

Article 1. We the undersigned, for ourselves, our heirs, executors, and administrators, do hereby give, grant, and for ever convey, to the said George Rapp and his associates, and their heirs and assigns all our property, real, personal, and mixed, whether it be lands and tenements, goods and chattels, money or debts due to us, jointly or severally, in possession, or in remainder, or in reversion, or in expectancy, whatsoever or wheresoever, without evasion or qualification or reserve, as a free gift or donation, for the benefit and use of the said association, or community; and we do hereby bind ourselves, our heirs, executors, and administrators to all such other acts as may be necessary to vest a perfect title to the same, in the said association, and to place the said property at the full disposal of the superintendants of the said community without delay.

Article 2. We do further covenant and agree to and with the said Geo. Rapp and his associates, that we will severally submit faithfully to the laws and regulations of the said community, and will at all times manifest a cheerful and ready obedience towards those who are or may be appointed as superintendants thereof, holding ourselves bound to promote the interest and welfare of the said community, not only by the labour of our own hands, but also by that

of our children, our families and all others, who now are, or hereaf-
ter may be under our control.

Article 3. If, contrary to our·expectations, it should so happen
that we could not render the faithful obedience aforesaid and should
be induced from that or any other cause, to withdraw from the said
association, then and in such case, we do expressly covenant and
agree to and with the said George Rapp and his associates, that we
will never claim or demand either for ourselves, our children, or for
any one belonging to us, directly or indirectly, any compensation,
wages, or reward whatever, for our or their labour or services, ren-
dered to the said community, or to any member thereof, but what-
ever we or our families jointly or severally shall or may do, all shall
be held and considered as a voluntary service for our brethren.

Article 4. In consideration of the premises, the said George
Rapp and his associates, do by these presents adopt the undersigned,
jointly and severally, as members of the said community; whereby
each of them obtains the privilege of being present at every reli-
gious meeting and of receiving not only for themselves but also for
their children and families, all such instructions in church and school
as may be reasonably required, both for their temporal good and for
their eternal felicity.

Article 5. The said George Rapp and his associates further agree
to supply the undersigned severally with all the necessaries of life,
as clothing, meat, drink, lodging, &c. for themselves and their fami-
lies, and this provision is not only limited to their days of health
and strength, but when any of them shall become sick, infirm or
otherwise unfit for labour, the same support and maintenance shall
be allowed as before, together with such medicine, care and attend-
ance and consolation as their situation may reasonably demand; and
if at any time after they have become members of the association,
the father or mother of a family should die, or be otherwise sepa-
rated from the community and shall leave their family behind, such
family shall not be left orphans or destitute, but shall partake of the
same rights or maintenance as before, so long as they remain in the
association, as well in sickness as in health, and to such extent as
their circumstances may require.

Article 6. And if it should happen as above mentioned, that any
of the undersigned should violate his or her agreement, and would,
or could not submit to the laws and regulations of the church or the
community, and for that or any other reason should withdraw from
the association, then the said George Rapp and his associates agree
to refund to him or them, the value of all such property without
interest, as he or they may have brought into the community, in
compliance with the first article of this agreement, the said value to
be refunded in one, two or three annual instalments, as the said
George Rapp and his associates shall determine.   And if the person
or persons so withdrawing themselves were poor, and brought no-
thing into the community, yet if they depart openly and regularly,

they shall receive a donation in money, according to the length of their stay, and to their conduct, and to such an amount as their necessities may require, in the judgment of the superintendants of the association.

In witness whereof and in testimony that the undersigned have become members of the said community, upon the conditions aforesaid, they have hereunto severally and each for himself set their hands and seals on the 9th day of March, in the year 1827.

In presence of
　John Hopkins, &
　Charles S. Voltz.

Translation from the German article executed at Harmony, Butler county, February 15, 1805.

Be it hereby known to all who need to know it, that the following agreement has this day been made and concluded between us, the subscribers of the one part, and George Rapp and his associates of the other part.

Article 1. We the subscribers, on our part and on the part of our heirs and descendants, deliver up, renounce and remit all our estate and property, consisting of cash, land and chattels, or whatever it may be, to George Rapp and his associates, in Harmony, Butler county, Pennsylvania, as a free gift or donation, for the benefit and use of the community there, and bind ourselves on our part, as well as on the part of our heirs and descendants, to make free renunciation thereof, and to leave the same at the disposal of the superintendants of the community as if we never had nor possessed it.

Article 2. We do pledge ourselves jointly and severally to submit to the laws and regulations of the community, and to show due and ready obedience towards those who are appointed and chosen by the community as superintendants, in such a manner that not only we ourselves endeavour by the labour of our hands to promote the good and interest of the community, but also to hold our children and families to do the same.

Article 3. If contrary to our expectation the case should happen, that we jointly or severally could not stand to it in the community, and would within a few or more years break our promises and withdraw from the community, for whatever cause it may be, never to demand any reward, either for ourselves or children or those belonging to us, for any of our labours or services rendered, but whatever we jointly and severally shall or may do, we will have all done as a voluntary service for our brethren.

In consideration whereof George Rapp and his associates adopt the subscribers jointly and severally as members of the community, whereby each of them obtains the privilege to be present at each religious meeting; and not only they, themselves, but also their children and families, shall and will receive the same necessary instruc-

tion in church and school which is needful and requisite for their temporal good and welfare as well as eternal felicity.

Article 2. George Rapp and his association promise to supply the subscribers jointly and severally with all the necessaries of life, as lodging, meat, drink, clothing, &c., and not only during their healthful days but also when one or more of them become sick or otherwise unfit for labour, they shall have and enjoy the same support and maintenance as before; and if, after a short or long period, the father or mother of a family should die, or be otherwise departed from the community and leave a family behind, they shall not be left widows or orphans, but partake of the same rights and maintenance, as long as they live or remain in the community, as well in sick as healthful days, the same as before, or as circumstances or necessity may require.

Article 3. And if the case should happen as stated above, that one or more of the subscribers after a short or long period, should break their promise and could or would not submit to the laws and regulations of the church or community, and for that or any other cause would leave Harmony, then George Rapp and his association promise to refund him or them, the value of his or their property brought in, without interest, in one, two or three annual instalments, as the sum may be, large or small; and if one or more of them were poor and brought nothing in the community, they shall, provided they depart openly and orderly, receive a donation in money, according to his or their conduct while a member, or as his or their circumstances and necessities may require, which George Rapp and his association shall determine at his or their departure.

In confirmation whereof both parties have signed their names. Done in Harmony, February 15, 1805.

Translation from the German article executed at Harmony, Indiana.

Be it hereby known, that to-day, (20th January, 1821,) in the year of our Lord one thousand eight hundred and twenty-one, the present agreement, treaty and alliance was made and concluded between us, the following persons, to wit: N. N. &c. of the one part and George Rapp and his association of the other part.

After the aforesaid persons became sufficiently acquainted with the principles, rules and regulations of the community of George Rapp and his association, by virtue of their religious principles, they have, after long and mature reflection, out of their own free will, determined to join the community of said George Rapp and his association in Harmony, Passey county, state of Indiana: to that purpose the aforesaid persons bind themselves and promise solemnly by these presents, to comply with the ordinances, rules and regulations of the community, and render due obedience to the superintendants ordained by the community, and to perform as much as possible all occupations and labours to which they are ordered, and help to promote the benefit, happiness and prosperity of the community. And

if the case should happen that the aforesaid persons, jointly or singly after a short or a long period of time, leave the community for any cause whatever, they hereby bind themselves jointly and each for himself separately, never and in no case to bring any account, nor make any claim, either against the association or any individual member thereof for their labour and services rendered; also, never to make any demand; ask or claim any other payment, under any name and description whatsoever, but will do and have done all things out of Christian love for the good and benefit of the community, or else take it as a gift, if George Rapp and his association willingly give them something.

However, George Rapp and his association in return adopt the aforesaid persons into their community, whereby they obtain prerogative to partake of all meetings for divine services by which they receive in church and school the necessary instructions, requisite and needful for their temporal benefit and happiness and eternal felicity. George Rapp and his association bind themselves further, to supply the aforesaid persons with all the wants and necessaries of life, to wit: meat, drink, clothing, &c., and indeed not only during their healthful days, but also if all or any of them get sick or otherwise infirm and unable to work, they shall, as long as they remain members of the community, receive and enjoy the same support as before, during their better days, or as their circumstances may require.

In confirmation of these presents we both parties have hereunto set our hands and seals. Done in Harmony the day and year above stated.

The court below (Bredin, President) was of opinion that the plaintiff was not entitled to recover, and the following parts of the charge were assigned as errors.

" 1. If there is evidence to satisfy you that the defendants and the intestate were joint partners and agreed to be jointly liable, then the suit is well brought, but if you are not satisfied from the evidence that they were joint partners and jointly bound to be liable to each other, the suit is wrong brought. It should have been brought against the defendants separately, and therefore in this suit, whatever they might do in another suit, the plaintiff would not recover."

" 2. If the defendants as to the real estate were tenants in common with the plaintiff, and you have evidence that they received more than their share of the profits of the real estate, then the defendants are bound to account."

" 3. The articles of association executed by the plaintiff's intestate are a complete bar to the plaintiff's recovery in this case, unless the plaintiff's intestate has had a fraud practised upon him, and been induced to sign them by fraud and imposition : if fraudulent they would not be a bar."

" 4. The deed and release are also a bar to the plaintiff's re-
covery unless the intestate was fraudulently imposed on, and the
execution and delivery of them were procured by fraud and impo-
sition."

" 5. There is nothing in the articles of association given in evi-
dence that renders the agreement unlawful or void; nothing in them
inconsistent with constitutional rights, moral precepts, or public
policy."

" 6. The law knows no duress by advice and persuasion. Was
there any thing more than advice and persuasion used by Mr Rapp
to induce the members to execute the articles of association? Or is
there any evidence that Peter Schriber was induced by threats to
execute the articles of association? If there is not, the plaintiff can-
not recover: the article of association bars him."

" 7. The jurors can easily apply the rule of law by asking them-
selves, would any thing that has been proved by any of the wit-
nesses, induce any of you (them) to sign such a contract. If you
answer, on your oaths, that you would sign them, the contract is
void; if you answer that you would not, then the contract is valid."

*Shaler* and *Watts*, for plaintiff in error.
*Biddle* and *Forward*, for defendants in error.

The opinion of the Court was delivered by

GIBSON, C. J.—The points made at the argument are reducible
to two; but one of which is attended with difficulty, for it is not
susceptible of doubt that the articles and release, if fairly obtained,
are conclusive of the right. An association for the purposes expressed,
is prohibited neither by statute nor the common law; and it is clear
that, except for the amount of its income, this society would be en-
titled to a charter by our statutes for self-incorporation. It may be
true that the business and pursuits of the present day, are incompa-
tible with the customs of the primitive Christians; but that is a mat-
ter for the consideration of those who propose to live in conformity
to them. Our laws presume not to meddle with spiritualities; and
religious societies are regarded by them but with an eye to their
temporal consequences. It has not been pretended that this society
is detrimental to the public or its neighbours. It is an ecclesiastical
community, performing, with alacrity, its duties to the laws, render-
ing unto Cæsar the things that are Cæsar's—and fashioning its mu-
nicipal rules of property and government after the models of those
Christian societies that existed in the days of the apostles. Its most
peculiar features are submission to the will of its founder, and equal
participation of property brought into the common stock by indi-
viduals or produced by the labour of the whole. That it is not a
partnership, results from the fact that the profits are not shared in
severalty. At the period of initiation, the neophyte surrenders his
worldly wealth to the society, reserving to himself but the contin-

gent right of resumption in the event of his secession, to which none but those who were creditors at the time could object, for all else would deal with him on the basis of a transfer already made. In the present instance, it is not alleged that there were creditors; without which, as was determined in Buehler *v.* Gloninger, 2 *Watts* 226, the administrator could not interfere. It is supposed, however, that as the intestate had power, by the articles, to secede from the society and take out of it whatever he had brought into it, the successor to his personal rights may exercise it as his representative. Such, however, are not the terms of the articles; nor would a posthumous exercise of the power, consist with the disposition he thought fit to make by dying in fellowship. An exercise of it by the administrator of one dead without kindred, would wrest the property from the society only to give it to the éstate by escheat. The right of secession, therefore, is intransmissible; and were it not, the intestate's release would be a bar. The question susceptible of argument, then, is whether there were such evidence of fraud at the execution of the papers, as might be left to the jury.

The matters adduced in proof of it, are the emphatic representations of Mr Rapp during the transaction. One of the witnesses testified that, " as to the articles signed at Economy, Rapp made a long speech; said every one who would sign, would have his name written in the Lamb's book of life; that if they did not, their names would be blotted out, and God would ask him about it; and that the members were induced to sign by what Rapp said." Another testified that when papers were to be signed, " Rapp prepared their minds for it a long time before; that he made them believe their names would be recorded in the book of life if they would sign; that he more than once said, it would be an unjust God that would bring them to happiness without asking him; and that the doctrine he preached had an effect on Peter Schreiber," whom the witness described as a weak old man, who believed on the assurance of Mr Rapp, that he would see the Lord in person within two years and a half from the time at which he spoke. A third said: " When they wished them to sign, George Rapp always made a long speech about it; said that if they would sign, their names should be written in the Lamb's book of life; that if they did not, their names would be struck out, and they would go to hell. When I signed, he told me so sure as I signed, my name would be in the Lamb's book of life." From this, there is little doubt that he put in action all the springs of his influence, sustained by all his spiritual artillery; and the question is, whether that alone, startling as it may seem, is so indicative of imposition that it may be left to a jury as evidence of it.

Lord Hardwick's admirable analysis of fraud, in Chesterfield *v.* Janson, 2 *Ves.* 155, reduces it to four species; such as is constituted of direct imposition; such as may be *presumed*, contrary to the general rule, from the relation of the parties; such as may be collected

v.—2 v

[Schriber v. Rapp.]

from the intrinsic value of the bargain; and such as arises from the contract being an imposition on third persons. The fraud imputed here, belongs to the first; for the bargain is not such as a rational and undeluded man might not make, or one whose consequences may affect those who are not parties to it; nor is it open to objection by reason of the circumstances and position of those who are. The relation of pastor and people, unlike that of *cestuy que trust* and trustee, guardian and ward, and attorney and client, is not one which a chancellor views with distrust; not, perhaps, because the laity are sufficiently protected in England by the statutes to suppress superstitious uses; for these operate not on gifts to the established church; but because the relation is essentially a parental one. Are, then, the representations of Mr Rapp to be pronounced false and evincive of fraud? To say nothing of our judicial incompetence to pass upon the truth, he cannot have been guilty of imposition if he actually believed what he uttered; for the suggestion of falsehood, or suppression of truth, which constitutes this species of fraud, is wilful. He who conscientiously declares an indifferent or absurd theory to be essential to salvation, may be a fanatic, but he is not a cheat. What more, according to the general perception of divine truth, did Mr Rapp? It will not be pretended that there was direct evidence of his insincerity. Nor was it attempted *to be* shown that he is of superior intelligence or education, or less likely to harbour an extravagant opinion than the rest; or that those who are supposed to be his dupes, were under bodily or mental infirmity, or apprehensive of death, to give him an advantage over them; or that the dogma predicated by him, was more than an ordinary and a standard doctrine of his church. The mind of the intestate had become enfeebled by age; but he had been an orthodox member for more than twenty years, and had, within that time, not only assented to, if not subscribed, previous articles containing the same provision, but had delivered his money to the society as a free and absolute gift while his intellects were in their prime. Were it necessary, therefore, to insist that the defendant's title is independent of the articles, it might be done with entire success. Unless, then, Mr Rapp were an impostor from the beginning, a conclusion not to be gratuitously drawn in contradiction of the legal presumption of innocence, it is impossible to fix on him a fraudulent design by extrinsic evidence. What, then, is the intrinsic evidence? No one who has witnessed the workings of fanaticism in the strongest and most cultivated minds, will presume to set bounds to it; or say that the absurdity of a dogma is evidence of the insincerity of him who professes to believe it. To decide a cause by a criterion so uncertain, would be to refer it to the sectarism of the jury. It will not be said that the grant of a Roman Catholic to purchase *post mortem* masses, would necessarily be fraudulent in Pennsylvania, though their sufficiency to deliver from purgatory, had been preached to him in *articulo mortis;* yet it would be easy to predict the event,

if the truth of the doctrine were left, as a material question, to a jury of protestants, few of whom would think it less visionary than the dogma of Mr Rapp. Fortunately the law presumes not to settle differences of creeds and confessions; or to say that any point of doctrine is too absurd to be believed. Now that this power to enrol and blot out, is impliedly asserted in the act of constitution signed at Economy, is apparent in the preamble which runs thus: "Whereas, by the favour of Divine Providence, an association or community has been formed by George Rapp and many others, upon the basis of Christian fellowship, the principles of which, being faithfully derived from the sacred scripture, include the government of the patriarchal age, united to the community of property *in the days of the apostles;* and whereas, the single object sought, is to approximate, so far as human imperfection may allow, to the fulfilment of the will of God by the exercise of those affections which are essential to the happiness of man in time and in eternity." Now what was the community of property thus referred to as having prevailed in the days of the apostles, and as being the same that was intended to be revived under its scriptural sanction? It is thus described in the fourth chapter of the Acts. "And the multitude of them that believed, were of one heart and one soul: neither said any one of them that ought of the things which he possessed was his own: but they had all things in common. Neither was there any among them that lacked; for, as many as were possessed of lands or houses, sold them and brought the prices of the things that were sold, and laid them down at the apostles' feet: and distribution was made to every man according to his need." That these contributions were not merely voluntary, the awful punishment inflicted on Ananias and Sapphira for concealing a part of the price of their property, as related in the succeeding chapter, abundantly proves; for though it was demanded by Peter in reprehending their deceit: "While it remained, was it not thine own? and after it was sold was it not in thine own power?" yet it is not to be credited that they would have been permitted to exercise their right of separate ownership and remain in Christian fellowship. Ananias was emphatically told that he had "lied not unto man but unto God;" a distinction evincive of the origin of the duty, and the nature of the being who had set him to perform it; and showing that the law for whose violation he was to be struck dead, was not human, but divine. Such, under Providence, was the office and power of an apostle; and it is certain that Mr Rapp, though not actually an apostle, had reserved to himself the authority of one. It was testified that he held his office not by the voices of his people, but by delegation paramount—"as Moses and Aaron had held theirs"—and it is matter of history that he assumed it as the spiritual and temporal head, when he founded the society in Germany. Without, then, arrogating to himself the power to loose and to bind on earth and in heaven, he might conscientiously think conformity to the lives of

the primitive Christians to be essential to salvation, and impress it on them in the most striking terms. A vast majority of Christians, undoubtedly, think that the community of property ordained by the apostles, was of special and temporary appointment; but that opinion is, by no means, universal. The Moravians, the Shakers, and perhaps some others, hold a contrary one; and in Mr Rapp's community, conformity to this regulation is the predominant article of the creed. Then, to say, without express or circumstantial proof, that he did not believe in the indispensableness of it, would be to pronounce him, not only a hypocrite, but a hypocrite without a motive. Though the legal title is vested in him as a joint trustee, he has but an equal interest in the beneficial ownership. The basis ,of the association, it was testified, is " equal rights, equal enjoyments, and equal profits;" and such, too, are the provisions of the articles. The poor enjoy the privileges of those who were rich; and, should a division take place, would share in proportion to their original contributions. On this plan, it is impossible for Mr Rapp to enjoy more than another; or to increase his wealth by taking out of the stock more than he put into it. The sum of the matter is, that a member of a religious society may not avoid a contract with it on the basis of its peculiar faith, by setting up the supposed extrava- gance of its doctrines as proof that he was entrapped. The proper limitation to this would seem to be, that such a contract, with a so- ciety whose principles would shock the moral or religious sense of the community, which is a legitimate subject of legal protection, would be void for illegality. But such is not the society of George Rapp; and beside, that ground of defence has not been taken. Nor is it necessary to the protection of the ignorant that the law should' presume the existence of clerical hypocrisy without proof of it. The course of an impostor is always sufficiently marked with contra- diction to afford proof of artifice. Here, however, there was not only no extrinsic proof of imposition, but much that bore the other way; yet, without evidence to raise it, the question of fraud was left to the jury, and consequently, not injuriously to him who com- plains of the manner of it. The manner is immaterial, as he was not entitled to the benefit of the inquiry at all; and, independent of the objections to the form of the action, which it is unnecessary to decide, he was not entitled to a verdict.

Judgment affirmed.