Richard R. WIER, Jr., Attorney General of the State of Delaware, and William R. Lummis, Delaware Ancillary Administrator of the Estate of Howard R. Hughes, Jr., Plaintiffs,

v.

HOWARD HUGHES MEDICAL INSTITUTE, a Delaware Corporation, Defendant.

Court of Chancery of Delaware, New Castle.

Submitted July 12, 1979.

Decided Oct. 26, 1979.

Henry N. Herndon, Jr., Edward M. McNally and Daniel H. Krapf of Morris, James, Hitchens & Williams, Wilmington, for movant, the defendant, Howard Hughes Medical Institute.

Richard L. Sutton, Jesse L. Burke and Thomas John Allingham, II of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiff William R. Lummis, Delaware Ancillary Administrator of the Estate of Howard R. Hughes, Jr.

MARVEL, Chancellor:

This action to determine the appropriate person or entities to manage and control the policies of the defendant charitable corporation was filed jointly in the names of the Attorney General of the State of Delaware and of William R. Lummis, the Delaware ancillary administrator of the estate of the late Howard R. Hughes, Jr. The defendant Howard Hughes Medical Institute is a tax-exempt charitable corporation incorporated in Delaware and founded by the late Howard R. Hughes, Jr., in 1953, the latter having constituted himself at that time Trustee of the Institute with full pow-er to manage and control its affairs as provided for in the defendant's certificate of incorporation. The matter now before the Court in this litigation is whether or not the defendant Institute should be managed and controlled by a Trustee, as the late Mr. Hughes originally intended, or by a so-called Executive Committee.

The defendant Howard Hughes Medical Institute, while conceding the authority of the Attorney General of the State of Delaware to see to the proper administration of a Delaware charitable corporation, has, on the other hand, moved to dismiss this action insofar as it is brought by the plaintiff Lummis on the primary ground that such plaintiff, in seeking to participate in this litigation, has no clear legal right to assert and therefore lacks standing to participate in this proceeding as a litigant, *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975), and *Investment Company Institute v. Camp,* 274 F.Supp. 624 (D.D.C.1967). In response to this contention, the plaintiff Lummis argues that as a matter of law he has succeeded to Mr. Hughes' position as Trustee of the Institute, and that, in any event, as the Delaware ancillary administrator of the Hughes estate he has a duty to see to it that a qualified successor Trustee of the defendant Institute is appointed by this Court. The Howard Hughes Medical Institute was, as noted above, founded in 1953 as a non-profit Delaware corporation, having as its avowed purpose the advancement of human knowledge within the limits of the established sciences and the application of such knowledge to the improvement of the lot of mankind. It continues to perform such function on an increasing scale.

In addition to overseeing its clearly assigned medical research functions, a corporate Executive Committee of the Institute now claims full responsibility for overseeing the handling of the Institute's endowment fund, the growth in the value of which has allegedly permitted the Institute, as noted above, to continue to expand its medical research activities.

Such Executive Committee was established by Mr. Hughes on December 17, 1953, the day on which the Institute was incorporated. At the inception of the enterprise, at Mr. Hughes' direction, the Executive Committee was to " * * * have and exercise such powers, duties, and authorities as the Trustee may from time to time designate." On July 3, 1968, however, Mr. Hughes allegedly caused to be adopted the following so-called "Resolution of Trustee."

"RESOLVED that except as may be otherwise provided in the Certificate of Incorporation or in further resolutions of the Trustee, there is hereby delegated to the Executive Committee all of the duties and powers to manage the affairs of the corporation which Delaware law had conferred upon the boards of directors of corporations organized for profit."

As noted above, the original certificate of incorporation of the Institute had provided that the Institute was to be managed and controlled by a Trustee to be named by the incorporators, and on December 17, 1953, such incorporators had named Howard R. Hughes as such Trustee, a position he continued to hold until his death on April 5, 1976.

Such certificate of incorporation further provided that successor Trustees were to be chosen either by an incumbent Trustee or in the manner designated by the original Trustee. Inasmuch as Mr. Hughes died without naming a successor Trustee, or designating a means for selecting such a successor, the affairs of the Institute have in recent years been largely controlled by Mr. F. W. Gay and Mr. Chester C. Davis, majority members of the so-called Executive Committee of the corporation.

On March 1, 1957, the Internal Revenue Service had ruled that the Institute was a charitable corporation exempt from federal income taxation under the provisions of § 501(c)(3) of the Internal Revenue Code of 1954, and after passage of the Tax Reform Act of 1969, the Internal Revenue Service continued to be of the opinion that the Institute, being directly engaged in the continuous active conduct of medical research in conjunction with hospitals, as described in Section 170(b)(1)(A)(iii) of the Code, was tax exempt. The basis of these rulings is found in the fact that Mr. Hughes prior to his death did not have any pecuniary interest in either the Institute or its assets, inasmuch as the Institute, as in the case of any other tax exempt charity, could not have attained § 501(c)(3) status if either its articles of incorporation or applicable state law were to permit its assets upon dissolution to be distributed to its members or shareholders, or its net earnings in any manner be made to inure in whole or in part of the benefit of private shareholders or individuals.[1]

1. Both the certificate of incorporation and by-laws of the Institute reflect the requirements of the Internal Revenue Code by precluding Mr. Hughes or his estate from having any pecuniary interest whatsoever in either the Institute or its assets. Specifically, Articles SIXTH, SEVENTH and TENTH of the certificate of incorporation provide as follows:

"SIXTH: No dividends, earnings, profits, or assets of the corporation may be paid to or inure to the benefit of the Trustee or, except as otherwise provided herein, to any private individual.

"SEVENTH: The corporation shall not lend money to the Trustee or substantial contributor and it shall not make any gifts, contributions, or afford any benefits, direct or indirect, to the Trustee or substantial contributor. The corporation shall not purchase from or sell to its Trustee or substantial contributors any stocks, bonds, or other property of any nature unless the purpose and result of such transaction shall be to benefit the corporation financially.

\* \* \* \* \* \*

"TENTH: Dissolution of this corporation may be effected in any manner now or hereafter provided by law. In the event of dissolution from whatever cause, the Trustee shall liquidate the corporation by disposing of such of its assets as may be necessary to pay its obligations, and shall thereafter apply all of the remaining assets to such corporations, trusts, funds or foundations as are devoted exclusively to the purposes and objectives of this corporation and as may be determined by the Trustee. In no event, however, shall any corporate properties or assets be delivered to any trustee, committee, board, fund, foundation, institution or person which would cause such properties or assets to inure either directly or indirectly to the benefit of the Trustee or any substantial contributor of this corporation."

The Institute's methods of operation were recently reviewed by the Internal Revenue Service, which noted the growth of the Institute's medical research activities which had occurred since January 1, 1972, and reaffirmed its earlier opinion that the Institute is directly engaged in the active conduct of medical research and is thus tax exempt.

On July 10, 1978, the Executive Committee of the Institute, under the aforesaid alleged control of Messrs. Gay and Davis, purported to amend defendant's original certificate of incorporation and corporate by-laws so as to abolish the powers, duties, and office of the Trustee and to vest the authority of such office in themselves and a Dr. George W. Thorn, constituting a so-called Executive Committee,[2] it being noted that Mr. Hughes had allegedly approved an earlier by-law providing that in the absence of a Trustee the Executive Committee should also possess and exercise the powers of the Trustee.

The plaintiff Lummis now claims, as noted above, that as the personal representative of the estate of the late Mr. Hughes in the State of Delaware he has by operation of law become the Member and the Trustee of the Institute. Alternatively, said plaintiff contends that if he has not thus become the Trustee of the Institute, then, as the Delaware ancillary administrator of the Hughes estate, he has the duty to see to it that an appropriate successor Trustee is appointed by the Court.

It is the Institute's present position that both of these contentions fail as a matter of law, and while the Institute has taken the position that the appointment of a successor Trustee is in any event unnecessary because of the powers now allegedly vested in the Executive Committee, it must be assumed

for the purposes of the pending motion that the Institute's certificate of incorporation, as of prior to the July 10, 1978 amendment, is the controlling document, and that a successor Trustee is accordingly required, *Tatro v. Esham*, Del.Super., 335 A.2d 623 (1975).

In support of its first contention that Mr. Lummis did not as a matter of law succeed to the office of Trustee upon Mr. Hughes' death the Institute argues that as Mr. Hughes' Delaware ancillary administrator Mr. Lummis' sole duties are to collect the assets of the estate of the late Howard R. Hughes, pay such decedent's debts, and finally to distribute any residue and remainder to his domiciliary representative, or to the beneficiaries of his estate, *New York Trust Co. v. Riley*, 24 Del.Ch. 354, 16 A.2d 772 (1940). It is therefore contended that the professed interest of Mr. Lummis in the internal affairs of the Institute must necessarily exist only to the extent that any interest of Mr. Hughes in the defendant Institute constitutes an asset of his estate.

Referring to paragraphs of its certificate of incorporation as well as applicable by-laws, the Institute submits that Mr. Hughes' interests in such organization at the time of his death were solely those having to do with the appointment and removal of corporate officers, interests which had no pecuniary value and which could not conceivably pass to an executor or administrator.

■ Turning to the nature of the interest, if any, of the estate of the late Howard R. Hughes in the Institute, it is clear, first of all, that a member of a non-stock corporation has no vested right in such a membership in that unlike stock held in a busi-

2. These amendments as of July 10, 1978 deleted the references of the original charter and by-laws to a Trustee and provided in a so-called restated certificate of incorporation as follows:

"FIFTH: The corporation shall have no capital stock and shall be managed and controlled by an Executive Committee. The corporation shall have no Members (except to the extent required by the laws of the State of Delaware, in which event the Members

shall be the members of the Executive Committee and shall not, in their capacity as Members, have any voting rights except as required by the laws of the State of Delaware). The Executive Committee may, at any time and from time to time, delegate any responsibility and authority to such persons as it may select, in accordance with such by-laws or resolutions as the Executive Committee may adopt."

ness corporation, membership in a non-stock corporation may not be transferred or inherited unless the corporate charter or by-laws of such a corporation so provide, *McCaffrey v. Pittsburgh Athletic Ass'n*, 448 Pa. 151, 293 A.2d 51 (1972), and *In re Mt. Sinai Hospital*, 250 N.Y. 103, 164 N.E. 871 (1928). See also Chaffee, "The Internal Affairs of Association Not for Profit", 43 Harvard L.R. 993, 997 (1930) in which it is stated:

"A member, unless it is specifically provided otherwise, has no transmissible interest in the association while it is a going concern, by conveyance inter vivos or a will or inheritance, and has nothing which can be reached by his creditors."

Compare *Clark v. Brown*, Tex.Civ.App., 108 S.W. 421 (1908); *Schriber v. Rapp*, Pa.Supr., 5 Watts 351 (1936); *Goesele v. Bimeler*, 55 U.S. 589, 14 How. 589, 14 L.Ed. 554 (1852), and *Rehder v. Rankin*, 249 Iowa 1201, 91 N.W.2d 399 (1958), it being submitted by counsel for the Institute that the foregoing cases support the proposition that in reaching a determination as to the transferability or inheritability of a corporate membership, the presence or absence of some vested pecuniary interest in the assets or profits of the corporation involved is the test. Since Mr. Hughes held neither of such interests, it is contended that any membership which he may have held in said corporation was not inheritable, was not an asset of his estate, and therefore did not pass to the plaintiff Lummis in his capacity as the Delaware ancillary administrator of the Hughes' estate.

Next, as to Mr. Hughes' alleged secondary interest in the Institute, namely his interest in the office of Trustee, it is argued that such office, as in the case of the office of a corporate director or officer, became vacant at his death and was therefore not property subject to being passed to the personal representative of his estate, *Everett v. Transnation Development Corp.*, Del.Ch., 267 A.2d 627 (1970); *Burr v. Burr Corp.*, Del.Ch., 291 A.2d 409 (1972), and 8 Del.C. Section 223.

Finally, as to Mr. Hughes' powers to name a successor Trustee or Trustees, the method of such appointments, his power to appoint and remove members of the Executive Committee as well as to amend the Institute's charter and by-laws it is argued that such powers did not pass to his estate, the unexecuted right to exercise a power being in no sense analogous to an estate or a property right vested in a donee, *Equitable Trust Co. v. Union Nat. Bank*, 25 Del.Ch. 281, 18 A.2d 228 (1941). Since the mere possession of a power does not give the holder any interest or estate in the property subject to the power, I conclude that the powers of Mr. Hughes as Trustee did not of themselves constitute a property interest of the Institute, which upon the death of Mr. Hughes became an asset of his estate, *In re Buck Trust*, Del.Ch., 301 A.2d 328 (1973). Compare *In re Hart's Estate*, 177 Misc. 183, 30 N.Y.S.2d 147 (1941); *Culver v. Title Guarantee and Trust Co.*, 269 A.D. 627, 58 N.Y.S.2d 116 (1945). Accordingly, in my opinion, Mr. Lummis, as the Delaware ancillary administrator of the Hughes estate, has no present interest or right to the exercise of the powers of Trustee of the Institute.

Mr. Lummis also claims that even if he did not ipso facto become a successor Trustee of the Institute as the result of the death of Mr. Hughes, then in his capacity as the Delaware ancillary administrator of the Hughes estate he has the duty to see to it that a successor Trustee is appointed by this Court in order to prevent the failure of the charitable trust resulting from existing vacancies in the offices of Member and Trustee. The Institute counters this allegation by pointing out that the only conceivable basis for such a contention is the rule that the personal representative of a deceased trustee of a trust has an interest or duty to seek the appointment of a successor trustee, *Offutt v. Jones*, 110 Md. 233, 73 A. 629 (1909), and Bogert on Trusts, Section 529, although such a representative is not a necessary party to such a suit, *Bransford Realty Co. v. Andrews*, 128 Tenn. 725, 164 S.W. 1175 (1914).

And while it is conceded by the Institute that upon a trustee's death, the title to trust property passes to the trustee's personal representative until the appointment of a new trustee, *Corn Exchange National Bank & Trust Co. v. Jones*, 112 Pa. Super. 32, 170 A. 713 (1934); *Security Trust and Safe Deposit Co. v. Ward*, 10 Del.Ch. 408, 93 A. 385 (1915), and *In re Kittinger's Estate*, 9 Del.Ch. 71, 77 A. 24 (1910), neither the office of trustee nor the powers of such office actually pass, such office merely becoming vacant, *Kech v. McKinstry*, 206 Iowa 1121, 221 N.W. 851 (1928), 2 Scott on Trusts § 104, and Restatement of the Law 2d, Trusts, § 104, p. 233.

Counsel for Mr. Lummis next contend that inasmuch as trust principles are allegedly to be applied in cases dealing with charitable corporations, *Denckla v. Independence Foundation*, 41 Del.Ch. 247, 193 A.2d 538 (1963), 4 Scott on Trusts, § 348.1 at pp. 2278–2279, and Restatement 2d Trusts, page 210, and inasmuch as there is nothing in the Delaware General Corporation law or the Institute's charter or by-laws which deals with the question of standing to sue to enforce the Institute's charter, that this Court should apply principles of trust law with respect to said plaintiff's standing, *Paterson v. Paterson General Hospital*, 97 N.J.Super. 514, 235 A.2d 487 (1967), such principles of trust law allegedly being applicable here. In other words, it is argued that it is the law of Delaware that when a trustee dies and no provision has been made for a successor trustee, the legal title to the trust property descends to the deceased trustee's estate and that the deceased's personal representative falls heir to both the office of trustee and the powers thereof, *Friedley v. Security Trust & Safe Deposit Co.*, 10 Del.Ch. 74, 84 A. 883, 886 (1912). It is also argued that the cited case stands for the proposition that property interests passing to a decedent's estate need not have a pecuniary value and that the interest of the founder of a charity or his heirs or personal representatives have standing to participate in a proceeding hav-

ing to do with the enforcement and administration of a charitable gift, whether such a gift has been made in trust or to a charitable corporation, *Packard v. Thiel College,* 209 Pa. 349, 58 A. 670, 671 (1904); *Carter et al. v. Mayor and City Council of Baltimore*, 197 Md. 70, 78 A.2d 212, 218 (1951); *Kirwin v. Attorney General*, 275 Mass. 34, 175 N.E. 164, 168 (1931); *Associate Alumni v. General Theological Seminary*, 163 N.Y. 417, 57 N.E. 626, 627 (1900), and 14 C.J.S. Charities § 58d. Furthermore, it is argued that the aforementioned rule has been held to be especially applicable in cases such as the present one, namely in a situation in which the founder of a charity has not only donated his own funds for particular charitable purposes but has also retained the right to control the operations of such charity, *Associate Alumni v. General Theological Seminary*, supra; *Coffee v. William March Rice University*, Tex.Supr., 403 S.W.2d 340, 347 (1966), and "The Charitable Corporation", 64 Harvard Law Review 1168, 1177–1178.

However, I am satisfied that in the case at bar, which is concerned with a charitable corporation and not a trust in which Mr. Hughes retained a pecuniary interest, that the cases relied on by the plaintiff Lummis are inapplicable. Technically speaking, Hughes Tool Company and not Mr. Hughes was the donor of the corpus which created the Institute, but, in any event, as stated in 14 C.J.S. Charities § 58 "Persons Entitled to Enforce", " * * * where the donor has effectually passed out of himself all interest in the fund devoted to a charity, neither he, nor those claiming under him have any standing in a court of equity as to its disposition and control."

Next, it is contended that, in any event, the plaintiff Mr. Lummis has standing in this action on the basis of his alleged visitorial powers to see to it that the funds made available by Mr. Hughes to the charitable corporation here in issue are being applied according to the intention of the donor, a doctrine which was apparently sanctioned by the House of Lords and thereafter be-

came part of this country's common law,[3] *Dartmouth College v. Woodward*, 4 Wheat. (U.S.) 518, 563, 4 L.Ed. 629 (1819); *In re Murdock*, 7 Pick. (24 Mass.) 303, 321; *Trustees of Andover Theological Seminary v. Visitors of Theological Institute*, 253 Mass. 256, 148 N.E. 900, 906 (1925), and *Trustees of Putnam Free School v. Attorney General*, 320 Mass. 94, 67 N.E.2d 658 (1946). Such visitatorial power allegedly passes from the founder of a charitable corporation to his heirs, who allegedly succeed to the right to oversee the operations of the charity in question and to take steps to ensure that it is being properly operated, *Newton v. Lewis*, 118 Misc. 382, 193 N.Y.S. 438, 441–442 (1922), and *In re Murdock*, supra, at p. 321.

I conclude, however, that such common law principle no longer applies even in the case of a pure trust as opposed to a charitable corporation. Thus, it is stated in Bogert on Trusts § 416 at page 457:

"In a country such as the United States, where primogeniture is obsolete, the vesting of a power of visitation in the heirs of the donor is not desirable. Frequently, they constitute a very numerous class, are difficult to locate, and are not easily brought to agreement. Furthermore, in many cases they would be either wholly uninterested in exercising the right of visitation, *or would be openly hostile to the institution which had deprived them of a part or all of the fortune of their relatives.*" (emphasis supplied)

Finally, it is clear that under the normal rules of contemporary practice it is the Attorney General who has the exclusive power to bring actions to enforce charitable trusts, any other way of proceeding by way of actions brought by persons with an interest being likely to lead to confusing and vexatious litigation. As stated in the case of *State of Delaware v. Florida National Bank et al.*, Dist.Ct. of Appeal of Florida, Case No. JJ–388:

" 'The purpose of vesting in some public official such as the Attorney General the exclusive power to begin proceedings to enforce charitable trust is obvious. The persons affected by such trusts are usually some or all of the members of a large and shifting class of the public. If any member of this class who deemed himself qualified might begin suit, the trustee would frequently be subjected to unreasonable and vexatious litigation. Often no given individual can prove that he will necessarily benefit from the charity. All may be prospective or possible beneficiaries, but no one can be said to be a certain recipient of aid. In ultimate analysis it is the public at large which benefits, and not merely the individuals directly assisted. Obviously there is good reason for vesting in a single authority the discretion and power incident to the enforcement of such trusts, rather than in leaving the matter to the numerous, changing, and uncertain members of the group directly to be aided.' Bogert, Trusts and Trustees, 2d Ed. Revised § 411 (1977)."

See also earlier opinion of this Court in this same case, Del.Ch., 404 A.2d 140 (1979), and *Pollock v. Peterson*, Del.Ch., 271 A.2d 45 (1970).

On notice, a form of order dismissing this action insofar as it is brought by the plaintiff William R. Lummis may be submitted.

---

3. "To all eleemosynary corporations a visitatorial power attaches as a necessary incident; and in this connection it must be borne in mind that the words 'charitable' and 'eleemosynary' are practically synonymous, the latter designating technically a class of corporations organized for charitable purposes. These corporations are composed of individuals, and they are subject to infirmities, and are liable not to carry out the purposes of the original giver of the funds. The law, therefore, from very early times has provided that there shall somewhere exist a power to visit and to inquire into and correct all the irregularities and abuses, and to see that the charity is being applied according to the intention of the donor, and the common law in this regard is in force in most jurisdictions except so far as the same has been altered by constitution or statute." 14 C.J.S. Charities, § 54 p. 520.