### Bates Machine Co. v. Albert J. Bates et al.

87   225<br>a192s 138

1. SPECIFIC PERFORMANCE—*When it Can Not Be Demanded as a Matter of Absolute Right.*—Specific performance of a contract can not be demanded as a matter of absolute right in either party. Applications for it rest within the sound discretion of the court hearing the case.

2. SAME—*Requisites of the Application.*—Before a court of equity will compel the specific performance of a contract, it must appear that it is founded upon a good and valuable consideration, and is reasonably fair and just in all its parts.

3. SAME—*When it Will Be Denied.*—A court of equity will not lend its aid to give a party the benefit of an unreasonable or unjust contract, the enforcement of which would work a serious hardship.

4. PATENTS—*Assignment of Inventions.*—Courts draw broad distinctions between an obligation to assign inventions or improvements upon an existing thing, which the assignor has already assigned, and a mere obligation to assign in gross, inventions of any kind and character whatsoever, thereafter made. In the former case the courts have, as a rule, sustained such assignments.

**Bill for Specific Performance.**—Appeal from the Circuit Court of Will County; the Hon. ROBERT W. HILSCHER, Judge, presiding. Heard in this court at the May term, 1898. Affirmed. Opinion filed February 1, 1900.

GARNSEY & KNOX, attorneys for appellant; L. L. BOND, of counsel.

C. W. BROWN, attorney for appellees; JOHN R. BENNETT and E. H. GARY, of counsel.

MR. JUSTICE HIGBEE delivered the opinion of the court.

Prior to the year 1888, Albert J. Bates and William O. Bates, brothers, had established themselves in business in the city of Joliet in this State, as inventors and manufacturers of special machinery.

It appears from the evidence that A. J. Bates was possessed of great skill in designing intricate automatic machinery, and that William O. Bates had like skill in putting the designs of his brother into practicable and merchantable shape. In January, 1888, their assets, according to their inventory, appeared to be about $10,000, consisting of machinery used in their business, stock on hand and accounts. At that time, desiring to procure additional capital for the purpose of extending their business and making it more profitable, an agreement was made between the two brothers and one Joseph Winterbotham, by which the latter was to put certain money into the business and obtain an interest therein. This agreement was reduced to writing and is as follows:

"Be it known that A. J. Bates and W. O. Bates, under the name of Bates Brothers, being desirous of extending and enlarging their present business, have united their interests with Joseph Winterbotham, of Joliet, Illinois, under the following: Said A. J. and W. O. Bates put in their entire business, book accounts, notes, machinery, patterns, stock, etc., manufactured and unmanufactured, also all patents now in existence, and all inventions hereafter made by either the said A. J. or W. O. Bates. In consideration of the above, Joseph Winterbotham agrees to put in ten thousand dollars, five thousand dollars being hereby acknowledged, the remainder being paid as needed. It is the intention and full understanding of the parties hereto that they will, at earliest practicable time, organize a stock company with a capital stock of twenty thousand dollars, said capital to be made and fully represented by the assets above enumerated and the stock distributed as follows:

($\frac{1}{4}$) one quarter to A. J. Bates.
($\frac{1}{4}$) one quarter to W. O. Bates.

($\frac{1}{2}$) one half to Joseph Winterbotham or his assigns; the name of company to be known as Bates Brothers Co. or such other name as may be agreed upon. The officers of said Co. will be as follows; Joseph Winterbotham, Pres., J. R. Winterbotham, V. Prest., A. J. Bates, Secy. & Treas., with a salary of ($1200) twelve hundred dollars for 1st year and ($1500) fifteen hundred dollars for 2nd year, provided business pays 15 per cent or over from its organization; W. O. Bates to be superintendent with a salary same as A. J. Bates, and the raise the 2nd year subject to same conditions. A. J. and W. O. Bates to devote their energies and inventions to the business same as they are now doing. This agreement to be in effect from the 28th day of January, 1888.

> W. O. BATES.
> ALBERT J. BATES.
> JOSEPH WINTERBOTHAM."

In compliance with the terms of the agreement, a corporation known as the Bates Machine Company, the appellant herein, was organized, and at the first meeting of the directors, on February 28, 1888, officers were elected as therein provided for. In May, 1895, the Consolidated Steel and Wire Company (hereinafter called the " Consolidated ") was engaged in the manufacture of wire, barbed wire fencing and other wire products, one of its plants being located in Joliet. John Lambert was vice-president and general manager of the company, and Cory E. Robinson was manager of the Joliet mills, and salesman for the company at its general office in Chicago. About that time there were certain negotiations between A. J. Bates and Robinson concerning the invention of a woven wire fence and the invention and construction of a machine to manufacture it. Bates having undertaken to design such a fence, Robinson placed an order with the Bates Machine Company to construct a machine to manufacture the same. This order is as follows:

" JOILET, ILLINOIS, May 28, 1895.
BATES MACHINE COMPANY:
Please enter my order for one Automatic Woven Wire Fence Machine for making a woven wire fence 58″ high, of a design like that shown on blue print attached hereto.

The machine throughout to be built according to the design and plan of A. J. Bates, of Joliet, Ill., and under his direction, and I agree to pay for the machine as follows :

Fifty cents per hour for the labor thereon and three cents per pound for castings, and all other material, such as brass and steel, to be at the usual market price.

Payments to be made about the fifteenth of each month for all work done and material furnished for the month previous. Said machine to be built at the earliest possible date, and all patterns and designs for same to accompany and be delivered to the undersigned as his exclusive property.

It being distinctly understood that you are to make no machine or machines for making this woven wire fence for any other parties without my written consent.

                                        CORY E. ROBINSON."
" Accepted.
     BATES MACHINE CO.
          A. J. Bates, Secy."

This order was filed in the office of the Bates Machine Company and was numbered 6342. At that time A. J. Bates, as secretary and treasurer, had the right under the by-laws, to make contracts for the Bates Machine Company with third parties. On May 30, 1895, Robinson and A. J. Bates entered into an agreement to organize a corporation for the purpose of manufacturing and marketing woven wire fence, with a capital stock of $100,000, to be subscribed for by the parties in equal amounts, with a provision, however, that the wife of each should hold one share. It was further agreed therein that Bates should invent, design and patent a machine for the manufacture of a woven wire fence, substantially of a design shown by drawings attached thereto; that such machine should be manufactured at the works of the Bates Machine Company, upon the order and at the expense of Robinson, and when completed be turned over to said corporation in part payment of his subscription to the capital stock; that Bates should obtain a patent upon the application already filed by him for said woven wire fence, if it should be found patentable, and improvements thereon, and turn the same over also to said corporation; that the patents and designs so obtained or made by him should be

received as payment in full for the stock subscribed for by himself and his wife.   Work progressed on the machine under order No. 6342 until, although not fully completed, it was able to turn out a sample of the fence designed by Bates.   This fence was tested about the 20th of December, 1895, and found to be a failure.   The machine was therefore never completed, though the work done upon it was paid for by Robinson.   A patent, number 561,194, was, however, taken out on the fence on June 2, 1896.   On June 29, 1895, a license to receive subscriptions to the stock of the corporation styled the Standard Railroad and Farm Fence Company (hereinafter called the "Standard"), which was the corporation contemplated by the agreement between Robinson and Bates of May 30, 1895, was issued from the office of the Secretary of State and the stock subscribed by A. J. Bates, Ellen Bates and Robinson.   The final certificate of incorporation of this company was issued October 5, 1895, but was never recorded in the office of the recorder of Will county.   In July, Robinson and Bates leased a building, purchased machines for the manufacture of wire nails and barbed wire, and prepared to commence business.   About August 1, 1895, Lambert, the vice-president and general manager of the Consolidated, became interested in the enterprise of Robinson and Bates and purchased one-fourth of the stock of the Standard Company.   Lambert interested other officers of the Consolidated in the project to purchase the property of the Standard and the patents controlled by Bates and Robinson.   The result was a written contract, dated September 14, 1895, by which the Standard sold its property to the Consolidated for $40,000 cash, and the Consolidated agreed to cancel a certain contract it had with the Standard for wire and to assume a certain contract for wire which the Standard had with another company.   It was further agreed the Standard should construct the woven wire fence machine heretofore mentioned and at its completion notify the Consolidated, and if, after thirty days successful operation of the machine, its workings should prove satisfactory to the officials of the Consolidated, "said device,

improvements and patents, such as may be obtained for both machine and its product," should be assigned to the Consolidated, which should become the absolute owner of the same, and should then pay the further consideration of $40,000 in cash to the Standard; also that until the completion of the machine A. J. Bates should be in the employ of the Consolidated at a salary of $4,000 a year, for which he was to give his entire and exclusive attention, services and skill to the early completion and perfection of said machine and the business of the Consolidated; that if, after a final inspection of the above mentioned machine by the officials of the Consolidated, they should decide it was not to their interest to purchase the same, then all rights under the contract should cease and the machine revert to the Standard. The option contained in the above contract was subsequently extended to the Consolidated to the 25th day of July, 1896. On September 25, 1895, at a special meeting of the board of directors of the Bates Machine Company, Albert J. Bates resigned his office as secretary and treasurer, which he had held from the formation of the company, and was appointed consulting engineer of the same at a salary of $100 a month. Immediately after the failure of the first fence was demonstrated, A. J. Bates conceived the idea of another to obviate the imperfectiく ns of the first and proceeded to make a specimen of it by hand, which he exhibited to Robinson. It was thereupon agreed between Robinson and Bates and the Consolidated that he should proceed with the construction of a machine to manufacture the new fence. The new fence was subsequently patented on June 2, 1896, the patent number being 561,193. On January 7, 1896, A. J. Bates made an entry on the order book of the Bates Machine Company as follows:

" 7072, drawings for woven wire fence machine.

7073, patterns for woven wire fence machine.

7074, castings and machine work for woven wire fence machine."

Work under these orders was prosecuted by the Bates Machine Company, and on June 12, 1896, the Consolidated

was notified by A. J. Bates that the machine was completed and ready to stand the test of thirty days prescribed in the contract of September 14, 1895. About July 3, 1896, W. O. Bates caused a notice to be served on the Consolidated that the Bates Machine Company claimed rights and interests in the machine and the patent for the fence. The test of the machine terminated on the 12th of July, and it was then loaded upon cars of a railroad company for shipment. It was not delivered, however, by the railroad company, for the reason that W. O. Bates about that time notified it not to do so. On July 17th Robinson commenced an action of replevin in the Circuit Court of Will County against the railroad company to recover the machine. On account of the complications above referred to, the Consolidated required some guaranty of title to the machine and patent before paying the $40,000 provided for by the contract of September 14, 1895. Therefore, on July 25, 1896, an agreement was entered into by which Albert J. Bates, Robinson and the Standard, obligated themselves to do certain things in favor of the Consolidated, in reference to the fence machine of patent No. 561,193 and its product, and the said A. J. Bates guaranteed and indemnified the Consolidated to the extent of $20,000 against any claim of the Bates Machine Company or any one else in, to or against said machine or the title to the invention therein, or in its product. An attempt was made to settle and adjust all differences between A. J. Bates and the Bates Machine Company, resulting in an agreement dated September 10, 1896, which, after reciting the matters of difference between them, provided that the Bates Machine Company should relinquish any right to demand from said Albert J. Bates any interest in any invention which he might make after that date, except as to improvements upon certain machines then in existence, and that as to all inventions of every kind which Albert J. Bates might thereafter make, said writing of January 28, 1888, was abrogated, annulled and canceled; and as to the woven wire fence machine, and the patent for said woven wire fence in ques-

tion here, and a certain wire barbing machine, said writing should be and remain in full force and effect; that the intent of said instrument was " to permit said Albert J. Bates to contest the right of said Bates Machine Company to any right or interest in said inventions, and to permit said Bates Machine Company to insist upon a right to, interest in, or use of said inventions, and to use for such purpose said writing of date January 28, 1888." The agreement contained an option in favor of the Bates Machine Company, by which it could select for the purpose of the contest, either said woven wire fence machine or a certain other machine; but as said company afterward selected the woven wire fence machine, under the option given it, we may treat the contract as though referring to that machine alone. This agreement left to be contested in the courts the question of the ownership of, or the right to use, the following inventions : 1, woven wire fence patent No. 561,193; 2, the woven wire fence machine; and 3, the invention for a machine for barbing wire. On January 21, 1897, the Bates Machine Company filed its bill of complaint against A. J. Bates, C. E. Robinson and the Consolidated Steel and Wire Company, setting up the contract of January 28, 1888, and praying that specific performance be decreed against A. J. Bates, and that he be compelled to assign to complainant all patents which may be issued in the future or which may have been issued in the past, upon the three inventions last mentioned, or that he be decreed to grant an irrevocable and exclusive license to. complainant to use such inventions, and that Robinson and the Consolidated be required to assign to complainant any interest they may have acquired in the same. There was also a prayer for an injunction against the defendants to the bill, and the usual prayer for summons. Answers were filed by the defendants and afterward the Consolidated filed its cross-bill against the Bates Machine Company, as the sole defendant, setting up its claim to the patents for the wire fence and machine to manufacture the same, and alleging that the defendant therein was engaged in building certain of said

machines for another company, and that the same, after completion, would be removed out of the jurisdiction of the court. There was a prayer for temporary injunction against the removal of said machines, and also for perpetual injunction against the Bates Machine Company from any further construction or work upon said machines; from delivering them to the company said to have ordered them; from making or using them or like machines; from making any machines in violation of said contract of May 28, 1895; from asserting any right to the patent for said machine; and praying that the machine already constructed be delivered up to complainant in the cross-bill to be destroyed, and that complainant might have such other and further relief as the nature of the case demanded. An answer was filed to said cross-bill by the Bates Machine Company, and the latter afterward filed a supplemental and amended bill making certain additional allegations in support of its claim. Upon a trial of the cause the court entered a decree dismissing the original bill for want of equity. It also found for the complainant in the cross-bill and enjoined the Bates Machine Company from any further construction or work upon the machines mentioned therein, as being under contract to other parties than the complainant in the cross-bill; from delivering said machines, and from making, or making any use of, the same or like machines. It was further decreed by the court that the complainant in the cross-bill was the owner, both in law and in equity, of patent No. 577,639, which is the patent for the fence machine as originally designed, No. 591,996, the patent for the improved machine, and No. 561,193, the patent for the woven wire fence. From this decree the Bates Machine Company has appealed to this court.

The first question presented for our consideration by the record in this case is, whether the contract of January 28, 1888, entered into between Albert J. Bates, W. O. Bates and Joseph Winterbotham, who subsequently organized the Bates Machine Company, is such a contract as a court of equity will enforce in favor of the said company against

Albert J. Bates. The law is well settled that specific performance of a contract can not be demanded as a matter of absolute right in either party, but that applications for the same rest within the sound legal discretion of the court hearing the case. Inflexible rules can not be laid down for the exercise of this power, but before a court of equity will compel the specific performance of a contract it must appear that it is founded upon a good and valuable consideration, and is reasonably fair and just in all its parts.

A court of equity will not lend its aid to give a party the benefit of an unreasonable or unjust contract, the enforcement of which would work a serious hardship. · Hetfield v. Willey, 105 Ill. 286; 22 Am. Ency. of Law, 910.

The contract provided that said A. J. and W. O. Bates should "put in their entire business, book accounts, notes, machinery, patterns, stock, etc., manufactured and unmanufactured; also all patents now in existence and all inventions hereafter made by either the said A. J. or W. O. Bates." It was further provided therein that A. J. and W. O. Bates should "devote their energies and inventions to the business, same as they are now doing." The contract constituted in effect an agreement on the part of A. J. and W. O. Bates to assign to the corporation proposed to be formed any inventions they might thereafter make. It was without limit as to time, and was an attempt to secure to the corporation the result of all the future labors and investigations of the parties named, so far as inventions were concerned. Such attempts to bind all future products of a man's brain are not regarded favorably by the courts.

The United States and State courts, it may·be said, draw broad distinctions between an obligation to assign inventions or improvements upon an existing thing, which the assignor has already assigned, and a mere obligation to assign, in gross, inventions of any kind and character whatsoever, thereafter made. In the former case the courts have as a rule sustained the contract. This is well illustrated by the case of Berkery Mfg. Co. v. Jones, 71 Conn. 143, the opinion in which is cited at length by counsel for appellant. In that

case the defendant, Jones, entered into a written agreement
with the plaintiff, the Berkery Manufacturing Company, to
assign to it all his right, title and interest in and to the three
inventions mentioned in the agreement; Jones also agreed
that if at any time in the future, during the life of said corpo-
ration, he "should discover or invent any other or further
improvement in said improvements specified in said letters
patent, already issued and pending, or any invention or im-
provement in any other article which said corporation is
engaged in manufacturing," he would assign the same to
the corporation, "so that all right, title and benefit to the
same shall inure to said corporation and its successors with-
out cost or charge of any kind to said corporation for the
same." It appears that after the contract was made, during
the life of the corporation, and while it was engaged in the
manufacture and sale of ball-cock valves, Jones invented
a new and useful improvement in the same, to secure which
a patent was issued to him, and the question was whether
that invention came within the obligation of his written
agreement. It was held that the invention was an improve-
ment in the article which the corporation was engaged in
making, and which it was especially organized to make and
sell, and that therefore the invention in question clearly
came within the class which he had agreed to assign. The
contract was accordingly sustained.

In that case the agreement was limited to inventions
made during the life of the corporation, and to improve-
ments upon patents already issued or pending, and to inven-
tions and improvements upon articles which the corporation
was engaged in manufacturing. There are no such limita-
tions in the contract in question in this case, however, and
therefore a different rule applies. In the case of Aspinwall
Mfg. Co. v. Gill, 32 Fed. Rep. 697, it was said by Mr. Jus-
tice Bradley, of the Supreme Court of the United States,
then sitting at the Circuit, where the question arose con-
cerning an agreement covering future inventions without
limitations or qualifications, that "a naked assignment or
agreement to assign, in gross, a man's future labors as an

author or inventor—in other words, a mortgage on a man's brain, to bind all his future products—does not address itself favorably to our consideration."

In Palace Stock Car Co. v. Stable Car Line, 142 Ill. 315, it was said by the Supreme Court of this State, in speaking of an agreement to assign future inventions, " we but hold with other courts when we say that an agreement to assign, in gross, the results of an inventor's future labors and investigations should not be liberally construed as against such inventor," and the court thereupon cites approvingly the case of Aspinwall Mfg. Co. v. Gill, above referred to.

The same question was involved in the case of McFarland v. Stanton Mfg. Co., 53 N. J. Eq. 649. In that case the language of the contract contained a provision for the assignment of future inventions as follows:

" Including all letters patent of the United States now granted or applied for, for the same, or that may hereafter be applied for, including any and all improvements for or about the same or pertaining to the art of naphtha soap making."

In the opinion it was said by the court:

" The assignment of future improvements upon a machine in connection with the assignment of the patent for such machine is valid. A naked agreement to assign in gross a man's future labors as an inventor is not good. But where a man purchases a particular invention, secured by patent, which is open to indefinite improvement, he may stipulate for the sale of future improvements he may make upon it. The subsequent patent, to be within the terms of the contract, must be an improvement upon the original invention."

It appeared from the evidence that the book accounts, machinery, etc., which the Bates Brothers turned over to the corporation, were inventoried at about $10,000, and that Winterbotham put in $10,000 in money. The Bates Brothers contributed one-half of the assets of the enterprise and received one-half of the stock of the corporation, Winterbotham contributing the other half of the assets and receiving the other half of the stock. A. J. Bates was, by the contract, to be appointed secretary and treasurer, with a salary of $1,200 for the first year and $1,500 for the second

year, " provided business pays fifteen per cent or over from its organization," and W. O. Bates was to be superintendent, with the same salary.   A. J. and W. O. Bates were also to "devote their energies and inventions to the business, the same as they are now doing."   There was nothing in the contract to bind the company to retain them as officers or pay them salaries after the second year.   At the end of that time they could be deprived of both their offices and salaries; yet if the contract was a valid one they must still devote their energies and inventions to the business to the same extent as before.   There was no consideration for this undertaking on their part, no counter undertaking on the part of Winterbotham, and it was therefore entirely lacking in mutuality.

We are consequently of opinion that the complainant in the original bill is not entitled to a specific performance of said contract against A. J. Bates in regard to the patents in controversy, for the reason that in such respect it was unreasonable and wanting in mutuality, and its enforcement would work a serious hardship on him.   The court below therefore properly dismissed the original bill for want of equity.

But even if the contract was a good and valid one, as between the Bates Brothers and Winterbotham, could it in equity be enforced as against Robinson and The Consolidated Steel and Wire Company?   The patents with which they are concerned are No. 561,193, for the woven wire fence, and Nos. 577,639 and 591,996, which are the patents on the original machine to manufacture such fence and the improvement thereon.   Robinson testified that he had for several years prior to the time he made the contract with A. J. Bates of May 30, 1895, been talking to the officers of the Consolidated and trying to get them to go into the woven wire fence business "as the coming business," but that they did not take kindly to his remarks; that he also talked with A. J. Bates about " woven wire fence and a machine to make it fast and cheap;" that finally Bates came to him and said he had in his mind a plan for such a fence and a machine to build it; that he examined the fence

and soon afterward went into the contract with Bates above referred to. A. J. Bates testified to conversations with Robinson concerning the matter, and that prior to the making of said agreement with Robinson he had never designed or invented a woven wire fence, or machine for making the same. This testimony is not contradicted. As a result of the conversations between Robinson and A. J. Bates the agreement of May 30, 1895, was entered into providing for the formation of the "Standard" corporation, for the purpose of manufacturing and marketing woven wire fence, for the patenting of the design for the fence and a machine for manufacturing the same at the expense of Bates, for the manufacturing of said machine at the expense of Robinson, and for the assignment of all patents and designs of said corporation when formed.

There is no evidence that Robinson knew of the contract of January 28, 1888, between the Bates Brothers and Winterbotham, and there was no reason why he could not have entered into the contract he did with A. J. Bates. The suggestion as to the making of woven wire fence came from Robinson, and he had a right to employ Bates to make a design for the same and a machine to construct it. It was entirely proper for Robinson to contract for this work, with the understanding that it should belong to the proposed corporation when completed. The order for the construction of the fence machine of May 28, 1895, was signed by Robinson, who agreed to pay for all the work, and contained a provision that all patterns and designs were to be delivered to him as his exclusive property, and that no machine or machines for making such fence were to be made for any other parties without his written consent. This order was accepted by the Bates Machine Company through A. J. Bates, its secretary, who, it is conceded, had the power to make contracts for such company.

A. J. Bates testified that his brother, who had charge of the work constructed by the company, entered the order in the book himself; that the latter knew A. J. Bates was negotiating with Robinson, but made no complaint what-

ever about the terms of the contract, and was satisfied and glad to get the work; that he said nothing about the contract being unusual.

W. O. Bates testified that Robinson told him he had decided to give the Bates Machine Company the order, and he hoped "we would do all we could to rush it for him as soon as possible." "I told him we would do all we possibly could to build it as soon as possible." W. O. Bates further testified that he complained to A. J. Bates about the order, but his only objection seemed to be a fear that under it the company would not be entitled to build all the machines Robinson might want. It does not appear that he made any objection to Robinson's ownership of the patterns, designs, or machine. The expenses connected with the construction of the machine were charged to and paid by Robinson. For a time even the services of A. J. Bates were charged to Robinson, but when this was discovered by Bates he complained of that charge, for the reason that he was interested in the Standard, and the charge was withdrawn. It also appears that Robinson was charged for the services of one Hutchins, a former solicitor of patents, who was then in the employ of the Bates Machine Company, who made the drawings for the patent of the machine, and drew the specifications for both patents. It is not reasonable to suppose that if the Bates Machine Company expected to claim the patents it would charge Robinson for the services of its draughtsman in making these drawings and specifications.

The first fence designed by Bates proved a failure, and the machine for making the same, the work upon which ' had been paid for by Robinson, and was nearly completed, was abandoned. No new order in writing seems to have been given for the second machine, but A. J. Bates made entries Nos. 7072, 7073 and 7074, above referred to, upon appellant's order book, for drawings, patterns, castings and machine work "for woven wire fence machine." He testified that he entered these orders merely to separate the cost of the new machine from the old one, and to divide

the cost of the different classes of work on the new one. The work appears to have been prosecuted under the terms of the original order of May 28, 1895. In the meantime the Consolidated had purchased the interest of Robinson, A. J. Bates and the Standard in and to said inventions, and contracted to pay A. J. Bates a salary for his services, which fact was known to appellant' through its officers. Notwithstanding this knowledge, appellant continued the work of manufacturing said machine and receiving pay therefor. Whether the order for the machine which was made to construct the successful fence is to be treated as part of and a continuation of the original order, or as a new and independent order, is, in our opinion, unimportant, so far as the Consolidated is concerned. In either event the various facts and circumstances in evidence, above referred to, estop appellant from claiming the patents, as against said company.

It may be further noted that the first fence was tested and found worthless about the 20th of December, 1895; that thereupon A. J. Bates proceeded to make other designs, and that the entries on the order book of the Bates Machine Company, in reference to the same, were made January 7, 1896. Previous to that time, at a special meeting of the directors of the Bates Machine Company, held September 25, 1895, only a few days after the Standard had sold out to the Consolidated and A. J. Bates had become an employe of the latter, said Bates resigned his office as secretary and treasurer of the Bates Machine Company, was appointed consulting engineer at a much smaller salary, and thereafter appears to have devoted himself to the completion of said patents under his contract with the Consolidated.

W. O. Bates was elected secretary and treasurer in his place. This arrangement very materially changed the relations of the parties provided for by the original contract between the Bates Brothers and Winterbotham, and, if it did not constitute a virtual abandonment of the same, was such a change as to render it unreasonable that the Bates Machine Company should thereafter be permitted to enforce it in the manner it is sought to be enforced in this suit.

It is said that the Consolidated is not an innocent purchaser of said patents, and should not be held to be entitled to them, for the reason that it paid the second $40,000 provided by its contract with the Standard, A. J. Bates and Robinson after notice was served upon it, by the Bates Machine Company, of its claim to the same. The machine had been completed on June 12, 1896, while this notice was not served upon the Consolidated until July 3d following, when the test of the machine was in progress. Up to that time the Bates Machine Company had made no claim to the patents, while it had permitted Robinson and the Consolidated to pay large sums for the construction of the machine. The Consolidated had also paid $40,000 and incurred other debts under the same contract, which included the sale to them of the patents. It would not be equitable to permit the Bates Machine Company to receive pay for its work from parties who, to its knowledge, claimed the patents, and when the work was done, for the first time, set up its claim. It had by its actions already estopped itself as against the Consolidated from claiming the patents.

We are therefore of opinion that the cross-bill of the Consolidated Steel and Wire Company was properly sustained, and that there was no error in the decree in reference to the same.

For the reasons above given, the decree of the Circuit Court will be affirmed.