### ORDER OF ST. BENEDICT OF NEW JERSEY v. STEINHAUSER.

(Circuit Court, D. Minnesota, Second Division. June 22, 1910.)

1. RELIGIOUS SOCIETIES (§ 18*)—RELIGIOUS CHARITABLE ORDER—CONTRACTS WITH MEMBERS—VOW OF POVERTY.

The Order of St. Benedict of New Jersey is a charitable corporation chartered by the state whose members are required by the charter to be members of the religious order of St. Benedict. All members of such religious order take the vow of poverty, by which they renounce the right to individual ownership of property. The constitution of the corporation provides that it is agreed upon that no member shall claim more that a decent support, but shall, as soon as possible, convey all property which he then holds or thereafter may hold to the corporation. It further provides that members may voluntarily leave the order. *Held*, that the contract between a member and the corporation with respect to property is not in violation of public policy, but is valid and binding so long as a member retains his membership, and that property held by a member who died in full fellowship at the time of his death, which was acquired with his earnings, belonged to the corporation and not to his heirs.

[Ed. Note.—For other cases, see Religious Societies, Dec. Dig. § 18.*]

**2.** RELIGIOUS SOCIETIES (§ 18*)—RELIGIOUS CHARITABLE ORDER—CONTRACTS WITH MEMBERS—VOW OF POVERTY.

The fact that such member who was for some years before his death a resident of another state was permitted by the abbot to retain his earnings, and use the same for charitable purposes, did not release him from his vow of poverty, nor make such earnings his individual property, but merely constituted him agent of the order for its disbursement.

[Ed. Note.—For other cases, see Religious Societies, Dec. Dig. § 18.*]

**3.** EXECUTORS AND ADMINISTRATORS (§ 225*)—CLAIMS AGAINST ESTATE—TIME FOR FILING.

The claim of a third person that he is the owner of property in the hands of an administrator is not a claim that is within the jurisdiction of the probate courts of Minnesota, and is not affected by Rev. Laws Minn. 1905, § 3730, requiring claims against estates to be presented to the probate court for allowance within the time fixed by order of such court nor is it within section 3733, limiting the time within which actions may be brought against an executor or administrator on provable claims.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 225.*]

**4.** LIMITATION OF ACTIONS (§ 60*)—ACCRUAL OF RIGHT OF ACTION—PRINCIPAL AND AGENT.

Where an agent was permitted to retain and use for certain purposes property belonging to his principal, which authority had not been withdrawn at the time of his death, limitations did not begin to run until that time against an action by the principal to recover the property unexpended.

[Ed. Note.—For other cases, see Limitation of Actions, Dec. Dig. § 60.*]

**5.** COURTS (§ 489*)—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST ADMINISTRATOR.

While a federal court cannot interfere with property in the hands of an administrator, which is in the custody of the state probate court, it may adjudge the rights of parties before it in such property, and such adjudication will be binding on the administrator and may be enforced against him personally.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 489.*]

In Equity. Suit by the Order of St. Benedict of New Jersey against Albert Steinhauser, administrator of Augustin Wirth, deceased. Decree for complainant.

Otto Kueffner and Albert Schaller, for complainant.
Pitzer & Hayward, for defendant.

WILLARD, District Judge. This case presents a controversy in which the complainant claims that the property left by Augustin Wirth at his death belonged to it, because he lived and died a member of the Order of St. Benedict. The defendant claims that for various reasons the property belongs to the heirs at law. That the documents offered in evidence to show that Wirth belonged to the Order of St. Benedict, and that he had transferred his stability to the plaintiff, the Order of St. Benedict of New Jersey, were duly executed by Wirth, was admitted at the argument. Even without this admission the authenticity of the documents was sufficiently proven. From them it appears that Wirth became a member of the Order of St. Benedict at the monastery of St. Vincent in Pennsylvania, on August 15, 1852, and on

May, 1887, being still a member of the order, he transferred his stability from the Abbey of St. Benedict in Kansas to the Abbey of St. Mary, Newark, N. J., and therefore to the Order of St. Benedict of New Jersey, the complainant in this cause. Wirth died at Springfield, Minn., December 19, 1901. Some suggestion was made during the taking of the evidence and in the briefs of the defendant to the effect that Wirth in moving to Minnesota ceased to be a member of the Order of St. Benedict, and ceased to belong to the complainant corporation. I find as a fact, however, that at the time of his death he still remained a member of the order. Hoerr, a witness for the defendant, testified (defendant's record, 149, 150) that he saw Wirth about a year before his death at Mankato, Minn., wearing the habit of the Order of St. Benedict. A receipt was introduced in evidence (defendant's record, p. 152), dated Springfield, Minn., January 2, 1900, signed by Father Wirth, and to his signature he added the letters O. S. B. He also made a financial report of the Church St. Raphael, Springfield, Minn., of which he was then in charge from January 1, 1900, to January 1, 1901, to which he signed his name as Augustin Wirth, O. S. B. There is nothing to contradict the almost conclusive evidence furnished by this testimony and these documents. Dying within the order, it follows that he was also a member of the complainant corporation, for there is nothing to show that he had transferred his stability from the Order of St. Benedict of New Jersey to any other monastery, although there was at the time in Minnesota a monastery of the order at St. Cloud.

The first question for consideration is this: What effect upon his rights to property was produced by his joining the Order of St. Benedict? When he joined that order he took the three vows of chastity, poverty, and obedience. The only one of these vows which it is necessary to consider in this case is the vow of poverty. The rule of St. Benedict which governed the order provided in its chapter 33, as follows:

"The vice of personal ownership must above all things be cut off in the monastery by the very root, so that no one may presume to give or receive anything without the command of the Abbot; nor to have anything whatever as his own, neither a book, nor a writing tablet, nor a pen, nor anything else whatsoever; since monks are allowed to have neither their bodies nor their will in their own power. Everything that is necessary, however, they must look for from the father of the monastery; and let it not be allowed for any one to have anything which the Abbot did not give or permit him to have. Let all things be common to all, as it is written. And let no one call or take to himself anything as his own. But if any one should be found to indulge this most baneful vice and having been admonished once and again, doth not amend, let him be subjected to punishment." (Complainant's record, p. 25.)

This rule was in force in New Jersey when Father Wirth became a member of the Order of St. Benedict of New Jersey. The Abbot of St. Mary's testifying with reference to this rule said on page 123 of complainant's record:

"They lived in common with each other, and whatever they had the community gave to the monastery, only claiming what they needed of necessity; they have always been taken care of like the children of a family."

. And again on page 192:

"There is no member claims anything as his own, but getting all he needs from the common income that we have. No member can·call anything strictly his own, but for subsistence and for all he needs, all necessary· things, he depends upon the income of the community at large."

Father Engle, the Abbot of St. John's Abbey in Minnesota, testified as to the construction placed by the canon law upon the vow of poverty, and said on page 189 of defendant's record:

"A. As to vow of poverty when this is solemnly made in religious order it incapacitates such a member to possess or acquire property for himself and to make independent use of temporal things which can be valued in money."

And again on page 192:

"Q. You say that incapacitates members from possessing property or temporal things whose value can be measured in money. Is that a well-settled principle of your canon law? A. Yes, sir. Whatever a ·monk acquires he acquires for his monastery. Q. That, you say, incapacitates a member or monk from holding property? A. Yes; in his name and for himself."

The present Abbot of St. Mary's Abbey testified upon this subject as follows:

"Q. If a member subject to the dominion of the Abbot at Newark were to hold or obtain property of any description whatever in any state of the United States, would that property become the property of the order? A. It would. Q. And would it become such property of the order by virtue of the fact of vows which the possessor took? A. It would."

As a matter of history it is well known that the members of a religious order have no property of their own. This was so universally by the canon law, and it is declared to be the municipal law of Spain in the Seven Partidas, compiled and published in 1263. Laws 2, 14, and 22, title 7, Partida 1. Even if a monk did depart from the convent and ·had charge of a church, he still could acquire no property of his own. Law 26, title 7, Partida 1. How far the civil courts are bound by the canon law it is not necessary to inquire, nor is there here any question as to the effect of the judgment of an ecclesiastical tribunal, such as was presented in Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666, cited by the defendant. . Evidence as to the vows taken upon joining the order, and the testimony as to the effect of these vows is important only in the construction of the charter, constitution, and by-laws of the Order of St. Benedict of New Jersey.

The complainant here is not the Order of St. Benedict founded about the year 525, which is and always has been a religious order, but the orator in this case is a civil corporation chartered by the state · of New Jersey, and known as the Order of St. Benedict of New Jersey. Father Wirth was a member not only of the religious society, but also of the civil society, and the civil society is the entity bringing this suit. .Its rights must depend upon the construction given to its charter, constitution, and by-laws. If they differ from the rules governing the religious order, the latter must give way. That they do differ with regard to the matter of leaving the order will be seen later on in this decision.

What then do they provide? The act of the Legislature of New Jersey incorporating the Order of St. Benedict of New Jersey provides that certain persons named, "and their associate members of the society called the Order of St. Benedict, being a society of religious men living in community and devoted to charitable works and the education of youth" be constituted a body politic under the name above mentioned. (Complainant's record, p. 128). The charter also provides that the corporation may "make such by-laws for their government and for the admission of members into the corporation as they shall deem necessary and proper; provided, that such by-laws shall not be repugnant to, nor inconsistent with the Constitution of the United States or of this state." It also provides "that no person shall be or remain a corporator except regular members of said religious society, living in community and governed by the laws thereof."

The constitution provides, among other things, as follows:

"Section 2. The object of this corporation is divided between the educational training of youth and the spiritual guidance of souls. Each is conducted in conformity with principles and general discipline of the Roman Catholic Church and in accordance with the disciplinary statutes of the Order of St. Benedict, well known throughout the Roman Catholic Church."

"Section 10. To become and to be a member of this corporation it is absolutely necessary:

"1. To become a member of the Order of Saint Benedict founded about the year A. D. 525 by St. Benedict in Italy, and well known in the Roman Catholic Church.

"To have made solemn vows in the said order and to have received the Order of Priesthood in the Roman Catholic Church.

"Section 12. Since the Order of St. Benedict of New Jersey is solely a charitable institution, the real estate of said order and the individual earnings of its members, are and must be considered as common property of the Order of St. Benedict of New Jersey from which the members of said order derive their support and the balance of which income and property should serve for the following up and carrying out of the charitable objects of the order.

"It is therefore agreed upon by all the members of the said Order of St. Benedict of New Jersey that no member can or will claim at any time or under any circumstances more than their decent support for the time for which they are members of the charter of the Order of St. Benedict of New Jersey, and no further. And, moreover, that each member, individually pledges himself to have all property, which he now holds or hereafter may hold, in his own name conveyed as soon as possible to the legal title of the Order of St. Benedict of New Jersey."

That the vow of poverty, as understood by the canon law, is clearly binding upon members of that civil corporation, appears first, in the charter itself, and in section 10 of the constitution, which provide that only members of the Order of St. Benedict can become members of the civil corporation; second, by section 2 of the constitution which declares that the object of the corporation shall be attained in conformity with the principles and disciplinary statutes of the Order of St. Benedict; and especially, third, by section 12 of the constitution above quoted. All of these provisions were in force when Wirth joined the Abbey of St. Mary's in 1887. By joining the Abbey at that time Wirth agreed to give to it everything which he then had, and everything which he might thereafter acquire. The defendant now claims that, if that is the proper construction of the contract

made between the orator and Wirth when the latter joined the order, such contract is void on the grounds of public policy.

In order to determine whether this objection to the contract can prevail in this particular suit, it is necessary to consider just how the question arises here. We have not here a case where a member has been expelled, or has voluntarily left the order and is attempting to recover something that he has paid in; nor is it a case where a member has voluntarily left the order, where his relations with it have been entirely terminated, and notwithstanding this termination the order is attempting to compel the member to account for his earnings received after such separation. On the contrary, we have here a case where Wirth lived and died a member of the order. We have here a case where that order and Wirth both considered the contract binding upon them up to the time of the death of the latter. I say this, for although there is evidence that the Abbot of St. Mary's and Wirth did not agree, and that Wirth had been reprimanded by Hildebrand of Rome, Abbot Primate, yet, the fact remains that, notwithstanding these differences, he did not separate himself nor attempt to separate himself from the order, but died within it. The order on its part had fulfilled all its obligations to Wirth. It is true that he did not live in the Abbey or in New Jersey during the last years of his life, nor did the complainant contribute anything to his support, for that was not necessary. As soon, however, as the Abbot of St. Mary's was informed of the sickness of Father Wirth he at once requested the Abbot of St. John's, St. Cloud, to give such assistance as was necessary, and the Abbot of St. John's sent a member of the order to Springfield, who reached there a few days before Father Wirth's death. He was buried by the order at St. John's Abbey in St. Cloud.

So far as the performance of the contract is concerned, this presents the case of an executed contract, and not a case of an executory contract. It is thus distinguished from the cases of Hershy v. Clark, 35 Ark. 17, 37 Am. Rep. 1, and Bates Machine Co. v. Bates, 87 Ill. App. 225. The case is simply this: At the death of one who was at the time of such death a member of the order, there is found in his immediate possession and control certain property, which by the terms of the contract between the member and the order belonged to the order, but had not come into its possession; and the question is, does this property belong to the order, or to the heirs of the deceased member? Had such a case arisen in Spain after the promulgation of the Partidas, the monk would have been buried outside of the monastery in some dumping ground, and the money would have been buried with him. In later years, however, it was held that it was not necessary to bury all the money thus found, but it was sufficient to bury thirty denarii with him. Law 14, title 7, Partida 1. The claim of the defendant upon the facts hereinbefore set out is that the contract is void as against public policy. It is in effect a claim that had Wirth before his death paid over to the order what he received from the sale of his books or for his personal services, his administrator or his heirs could, nevertheless, after his death, have maintained an action to recover back the amount so paid and the value of his services.

The defendant says in his brief, page 64:

"That the alleged contract—the acknowledgment of the rule of St. Benedict, and the taking of the vow of poverty—incapacitates a member from holding property, and entitles the complainant to demand a recognition of that incapacity in a court of equity, in the United States in the twentieth century, is a startling proposition; in fact in the face of the principles underlying American institutions, of personal rights so jealously guarded in all our Constitutions, it is most astounding."

To me the astounding thing is, not that it should be claimed that such a contract executed as this was, was valid, but that it should be claimed that it was void. It would seem to be contrary to all sense of justice to say that after a person had joined such an order as this, had unselfishly devoted his life to the charitable purposes of its organization, had worked continually that the money derived from his labors might be used by the society for such purposes, and after it had been so used by it, and after the man had died in full communion with the order, that his heirs, his nephews and nieces, could maintain an action to recover from the order the value of the services of their ancestor. Yet that must be the result if the contract made between the orator and Wirth was contrary to public policy. That the purposes of the order are not contrary to public policy cannot for a moment be doubted. To doubt upon that point would be to doubt the doctrines of the Christian religion, and the teaching of the moralists of all ages. The defendant seizes hold of some statements made by the experts on canon law, to the effect that the vow of poverty incapacitates a man from holding property, and then says that the right to obtain and hold property cannot be divested any more than the right to his personal liberty. In this case we are not concerned with the question as to whether a person once a member of the Order of St. Benedict can ever be relieved from the vow which he took on becoming a member. It used to be said that not even the Pope himself could give him dispensation. Law 2, tit. 7, Partida 1. But this idea has for ages been abandoned, and that he can by the church be relieved from the vows is well settled. The witnesses on canonical law say that he could cease to be a member by secularization or expulsion, and that this takes place only with the consent of the order. It is thus seen that a person can be relieved from his vows even by the canon law. But the question is, as has been said before, not what were Wirth's relations to the Order of St. Benedict, but what were his relations to the Order of St. Benedict of New Jersey. It is distinctly provided in the constitution of the complainant that a member may voluntarily leave the order. Sec. 11 of the Constitution is as follows:

"Membership is lost at once: * * * (2) By voluntarily leaving the order for any purpose whatsoever."

Wirth could at any time have separated from the complainant. If he had done so, the complainant would have had no right to his future earnings. It cannot be said, then, that the contract entered into between the parties when Wirth became a member of the complainant forever deprived him of the right of acquiring property, and forever incapacitated him from owning property. He could resume his right to acquire property for himself at any time he chose. With this right of voluntary withdrawal, what ground can there be for saying that

the contract of 1887 was against public policy? On principle, it is very clear that it cannot be said to be so, and it is equally so on authority. The state of New Jersey having incorporated this society, one of the articles of which states that only members of the Order of St. Benedict can become members thereof, it cannot be said that such an organization as the complainant is contrary to the public policy of the state of New Jersey. The Legislature must have known what the religious order of St. Benedict was when it incorporated the Order of St. Benedict of New Jersey.

Cases very similar to the one at bar have been before the courts on several occasions. One of them is Goesele v. Bimeler, 14 How. 589, 604, 14 L. Ed. 554. In that case the court said:

"He then signed the first articles, which, like the amended articles, renounced individual ownership of property, and an agreement was made to labor for the community, in common with others, for their comfortable maintenance. All individual right of property became merged in the general right of the association. He had no individual right, and could transmit none to his heirs. It is strange that the complainants should ask a partition through their ancestor, when, by the terms of his contract, he could have no divisible interest. They who now enjoy the property, enjoy it under his express contract."

And again on page 605 of 14 How. (14 L. Ed. 554):

"What is there in either of these articles that is contrary to good morals, or that is opposed to the policy of the laws? An association of individuals is formed, under a religious influence, who are in a destitute condition, having little to rely on for their support but their industry, and they agree to labor in common for the good of the society, and a comfortable maintenance for each individual; and whatever shall be acquired beyond this shall go to the common stock. This contract provides for every member of the community, in sickness and in health, and under whatsoever misfortune may occur. And this is equal to the independence and comforts ordinarily enjoyed."

The same organization was before the court of Ohio in the case of Gasely v. Separatists Society of Zoar, 13 Ohio St. 144. The contract was held binding against one who having withdrawn sought a division of the property and an assignment to herself of her share.

Schriber v. Rapp, 5 Watts (Pa.) 351, 360, 30 Am. Dec. 327, had to do with the Harmony Society. The court said in that case:

"An association for the purposes expressed is prohibited neither by statute nor the common law, and it is clear that, except for the amount of its income, this society would be entitled to a charter by our statutes for self-incorporation. It may be true that the business and pursuits of the present day are incompatible with the customs of the primitive Christians; but that is a matter for the consideration of those who propose to live in conformity to them. Our laws presume not to meddle with spiritualities, and religious societies are regarded by them but with an eye to their temporal consequences. It has not been pretended that this society is detrimental to the public or its neighbors. It is an ecclesiastical community, performing with alacrity its duties to the laws, rendering unto Cæsar the things that are Cæsar's, and fashioning its municipal rules of property and government after the models of those Christian societies that existed in the days of the apostles. Its most peculiar features are submission to the will of its founder and an equal participation of property brought in the common stock by individuals, or produced by the labor of the whole."

In the case of Burt v. Oneida Community, 137 N. Y. 346, 353, 33 N. E. 307 (19 L. R. A. 297), the court stated the character of the society to be as follows:

"Necessarily the basic proposition of such a community was the absolute and complete surrender of the separate and individual rights of property of the persons entering it, the abandonment of all purely selfish pursuits, and the investiture of the title to their property and the fruits of their industry in the common body, from which they could not afterwards be severed or withdrawn, except by unanimous consent. It was fashioned altogether according to the pentecostal ideal, that all who believed should be together and have all things common."

The court then said, page 354 of 137 N. Y., page 308 of 33 N. E. (19 L. R. A. 297):

"These were the main features of the organization to which the plaintiff voluntarily became a party. It is not shown or found that he was induced to enroll himself among its members by any fraud or duress; and, in viewing it solely as a business undertaking, it was not prohibited by any statute or in contravention of any law regulating the possession, ownership or tenure of property. It imposed no unlawful restraint upon the alienation of property, for the title to its real estate could be conveyed at any time by the united action of its members if they so willed it. It was a joint holding of property by the adult members of the community, with this qualification: That upon the death or withdrawal of a member no share of interest therein passed to him or his personal representatives, but they who survived or remained continued to hold jointly the entire property in solidum."

In the case of Waite v. Merrill, 4 Me. 102, 118, 16 Am. Dec. 238, the plaintiff withdrew from the community of Shakers, and attempted to recover the value of his services while such a member on the ground that his contract of membership was void. The court said:

"It is said that it is void, because it deprived the plaintiff of the constitutional power of acquiring, possessing, and protecting property. The answer to this objection is that the covenant only changed the mode in which he chose to exercise and enjoy this right or power; he preferred that the avails of his industry should be placed in the common fund bank of the society, and to derive his maintenance from the daily dividends which he was sure to receive. If this is a valid objection, it certainly furnishes a new argument against banks, and is applicable, also, to partnerships of one description as well as another. It is said that the covenant or contract is contrary to the genius and principles of a free government, and therefore void. * * * In support of this objection, it is contended that the covenant is a contract for perpetual service and surrender of liberty. Without pausing to inquire whether a man may not legally contract with another to serve him for 10 years as well as 1, receiving an acceptable compensation for his services, we would observe that by the very terms of the fourth and fifth articles, a secession of members from the society is contemplated, and its consequences guarded against in the fifth by covenants never to make any claim for their services, against the society."

And again on page 120 of 4 Me. (16 Am. Dec. 238):

"Again it is urged that the covenant is void, because its consideration is illegal; that it is against good morals and the policy of the law. We apprehend that these objections cannot have any foundation in the covenant itself; for that is silent as to many particulars and peculiarities which the counsel for the plaintiff deems objectionable. The covenant only settles certain principles as to the admission of members; community of interest; mode of management and support; acquisition and use of the property; stipulation in respect to services and claims; professions of a general nature as to the faith of the society; and a solemn renewal of a former covenant and ar-

pointment of certain officers. * * * Now, what is there illegal in its consideration, or wherein is it against good morals or the policy of the law? It does not contain a fact or a principle which an honest man ought to condemn; but it does contain some provisions which all men ought to approve. It distinctly inculcates the duty of honest industry, contentment with competency, and charity to the poor and suffering."

The case of Gass & Bonta v. Wilhite, 2 Dana (Ky.) 170, 180, 26 Am. Dec. 446, had to do with another community of Shakers. It was held that seceding members had no right in or to the community property. The court said:

"So long as piety is recognized, by common assent, and by the Legislature, as a valuable constituent in the character of our citizens, the general law must foster and encourage what tends to promote it. In legal estimation, it must be viewed, as what is not only estimable in itself, but as an appurtenance to the characters of individual citizens, of great value to society, for its tendency to promote the general weal of the whole community. By the common assent of men in all time, it seems to be agreed that societies or communities of individuals, having its cultivation for their principal object, are necessary, or at least proper, auxiliaries to its support and propagation."

Schwartz v. Duss, 93 Fed. 529, decided by the Circuit Court for the Western district of Pennsylvania, involved the Harmony Society, the same organization which appeared in Schriber v. Rapp, supra, and in Baker v. Nachtrieb, 19 How. 126, 15 L. Ed. 528. In Schwartz v. Duss, the court said on page 530 of 93 Fed.:

"In view of the decision of the Supreme Court of Pennsylvania in Schriber v. Rapp, 5 Watts, 351 [30 Am. Dec. 327], and the decisions of the Supreme Court of the United States in Goesele v. Bimeler, 14 How. 589 [14 L. Ed. 554], and Baker v. Nachtrieb, 19 How. 126 [15 L. Ed. 528], it is clear that the above-recited articles of agreement are valid contracts, and that thereunder, upon the death of a member of the society in fellowship, no claim, enforceable against the society or its property, passes to his heirs or personal representatives, and that since 1836 no member voluntarily withdrawing from the society could acquire any such claim."

And speaking of persons who continued in the society until their death, as did Wirth in this case, the court also said on the same page:

"The other persons through whom the plaintiffs claimed remained with the society and died in fellowship. They thus received and enjoyed all the benefits secured to them by the recited articles of agreement, and therefore no rights, enforceable against the society, passed from them to their heirs or personal representatives."

The decree in that case was affirmed by the Circuit Court of Appeals of the Third circuit (103 Fed. 567, 43 C. C. A. 323), and by the Supreme Court in 187 U. S. 8, 26, 23 Sup. Ct. 4, 10, 47 L. Ed. 53. The Supreme Court, in affirming the judgment, said:

"That agreement was the affirmation and the continuation of the prior agreements, and they were held not to be offensive to the public policy of Pennsylvania, by the Supreme Court of that state in Schriber v. Rapp, 5 Watts, 351 [30 Am. Dec. 327]. The trial court in that case had instructed the jury that 'there is nothing in the articles of association (those of 1805, 1821, and 1827) given in evidence that renders the agreement unlawful or void; nothing in them inconsistent with constitutional rights, moral precepts, or public policy.' The Supreme Court observed that the point made against the articles as being against public policy was attended with no difficulty, and Chief Justice Gibson said for the court: 'An association for the purposes expressed is prohibited neither by statute nor the common law.' And it did not

occur to this court in Baker et al. v. Nachtrieb, 19 How. 126 [15 L. Ed. 528], to treat them as invalid contracts.   See, also, Goesele v. Bimeler et al., 14 How. 589 [14 L. Ed. 554]; Speidel v. Henrici, 120 U. S. 377 [7 Sup. Ct. 610, 30 L. Ed. 718]."

Some of the questions here involved were before the Circuit Court of the Southern district of New York, where a demurrer to a bill very similar to the bill in this case was overruled.   Benziger v. Steinhauser (C. C.) 154 Fed. 151.

No one of the cases cited by the defendant shows that the contract evidenced by the complainant's charter, constitution, and by-laws is contrary to public policy.   The one that comes nearest to it is Baltimore Humane Society v. Pierce, 100 Md. 520, 60 Atl. 277, 70 L. R. A. 485.   It was there held that the contract by which Pierce agreed on entering a Home for Aged Men to convey to the society all property which he might thereafter acquire by device or legacy was void as against public policy.   Without passing upon the soundness of this decision, it is enough to say that it furnishes no support for the proposition that after Pierce's death his executor could have recovered from the home the value of the services which Pierce might have rendered to it in consideration for his support during his life.

I conclude that the contract here involved was not void as being against public policy, or for any other reason, and that it was binding on Wirth at his death and upon his heirs now, unless it was in some way modified in his lifetime.   The claim of the defendant is that there was such modification.

Father Wirth was an author of some repute, and for a long time prior to his death published many of his works.   He made a contract in 1897 with Benziger Bros., publishers, by which they agreed to publish his books and pay him a royalty thereon.   Father Wirth procured in his own name copyrights on some of these books.   It is proven beyond doubt that not only the money paid to Father Wirth by Benziger Bros., but also all which he received from the sale of his books, he kept and used during the latter years of his life, turning none of it over to St. Mary's Abbey.   It is also proven that while the Abbot required Father Wirth to account for moneys which he received for his services in the different churches with which he was connected, the Abbot never required him to account for any of the money which he received from the sale of his books.   It is also proven that the Abbot of St. Mary's knew of the contract between Benziger Bros. and Father Wirth, and knew also, that before that time Father Wirth had received and was receiving money from the books which he published. The testimony also shows, both that of the complainant and that of the defendant, that Wirth was given permission by the order to use the money which he received from his book.   There is some controversy in the evidence, however, as to the precise terms of that permission.   That it was oral is proven.   The testimony of the complainant is that the permission was simply that Father Wirth might himself dispose of the money for charitable purposes, instead of turning it over to the Abbey.   Of the witness for the defendant upon this point, only two need be considered—Rose Schneider and Elizabeth Wirth. The testimony of Florian Wirth, the husband of Elizabeth Wirth, one

of the heirs, upon this point is not entitled to any weight, for although he said in several places that Father Wirth told him that he had permission to use the money derived from his books for any purposes he saw fit, yet he said at two different places that Father Wirth never said anything to him about the disposition which should be made of this money. Rose Schneider testified that Father Wirth told her that whatever he earned with his pen was his own, and that he had received permission from the Abbot. Elizabeth Wirth testified that Father Wirth told her that he had permission from the Abbot to write books, and that he could do with the money what he liked. I find, however, as a fact, that the permission was to use the money only for charitable purposes. The evidence does not justify a finding that there was a permission that the money which he received from the sale of his books should belong to him as an individual. Such a permission would be entirely inconsistent with the vow of poverty, the fundamental idea of the order, and it would be beyond the power of the Abbot to give. There is nothing in the charter, constitution, or by-laws which authorizes the Abbot to single out one of the monks, and say to him that all or a part of what he earned might belong to himself. The effect of the permission that was given was to make Wirth the agent of the order in disposing of the money in charity, which agency terminated with his death. Whatever he had thus disposed of, the complainant would be estopped from recovering now. But the permission falls far short of an agreement that whatever he left should after his death belong to the heirs and not to the order. The permission being thus stated, namely, to use the money for charitable purposes, the argument of the defendant, based upon the practical construction of the contract by the parties, laches, and estoppel, loses its force. While it is proven that the Abbot knew that Wirth was receiving the money, and that he had invested it in his own name, yet there is nothing to show that he ever knew that Wirth claimed it as his own so that it would go to his heirs at his death. It is very apparent that Father Wirth was treated with a great deal of consideration by the Abbot and other members of the order. The explanation of this is found in his age, the state of his health, his ability, and the distinguished services which he had rendered to the order.

From what has been said it appears that the contract was valid, and that as made originally it continued until Wirth's death. By it, all that he acquired during his lifetime became the property of the order. Even that which he paid out he paid out, not as his own, but as the money of the order. When he died everything that he left belonged to the order, and though the title to it stood in his name, that fact did not make it the property of his heirs. It was the property of the order, and a court of equity could compel the heirs and administrator to account therefor.

Some objections to granting the complainant any relief are made by the defendant, based upon the statute of limitations and the probate law of Minnesota. One of these objections is that the complainant never presented its claim to the probate court.

Section 3730, Rev. Laws Minn. 1905, provides in part, as follows:

"All claims against the estate of a decedent, arising upon contract, whether due, not due, or contingent, must be presented to the court for allowance, within the time fixed by the order, or be forever barred."

That the claim of the order was not a provable claim under this section is very clear. It does not claim damages for breach of a contract, but claims the property itself. It claims, for example, to be the equitable owner of the real estate situated in Minneapolis, and of the copyrights, and of the notes now in the possession of the administrator. The claim of a third person that he is the owner of property in the hands of an administrator is not a claim that is within the jurisdiction of the probate courts of Minnesota. Mousseau v. Mousseau, 40 Minn. 238, 41 N. W. 977. The case of Jorgenson v. Larson, 85 Minn. 134, 88 N. W. 439, cited by the defendant, was not an action for specific performance, but was a claim for damages. The plaintiff in that case by virtue of his executory contract signed only by the husband, was never the owner, legal or equitable, of the wife's one-third interest in the property. As the claim in this case was not a provable one, it is not necessary to consider the case of Security Trust Company v. Black River National Bank, 187 U. S. 211, 23 Sup. Ct. 52, 47 L. Ed. 147, cited by the defendant, nor his argument based thereon, to the effect that the laws of Minnesota relating to proof of claims are binding upon the national courts sitting therein.

The defendant also relies upon section 3733 of the Revised Laws of Minnesota. That section is as follows:

"No action at law shall lie against an executor or administrator for the recovery of money upon any demand against the decedent allowable by the probate court, and no claim against a decedent shall be a charge upon his estate unless presented to the probate court for allowance within five years after his death: Provided, that nothing in this section shall be construed as preventing an action to enforce a lien existing at the date of decedent's death, nor as affecting the rights of a creditor to recover from the next of kin, legatees, or devisees to the extent of assets received."

The claim here in question not being a provable claim, the first part of the section does not apply, nor does the last part of the section apply for the same reason. That part is not, as the defendant claims, entirely without limitation. It is qualified by the nature of the claim, for it assumes that it is a claim which may be allowed by the probate court. The section itself on its face, as well as its history, shows, too, that it contemplates a lien upon the estate by virtue of proceedings in the probate court, and not in courts of general jurisdiction.

The defendant also claims that the suit is barred by the general statutes of limitation of Minnesota. Section 4076, Revised Laws of Minnesota. The limitation is one of six years. Wirth died December 16, 1901. The bill was filed on August 19, 1907, and therefore within six years from his death.

As has been before said, the relations between Wirth and the order were such that all that he acquired belonged to the order. As agent of the order, he had a right to dispose of for charitable purposes the money which he derived from his books, but the part of his money which at the time of his death he had not disposed of then was, as it always had been, the property of the order. No cause of action there-

fore arose against Wirth during his life as to that property which he had not disposed of. This suit was commenced within six years after his death, when for the first time any cause of action as to the property so remaining arose. Section 4085 of the Revised Laws of Minnesota has no bearing upon this case. It was intended by this section to lengthen, not to shorten, the limitation provided for in the general law. Wilkinson v. Winne, 15 Minn. 159, 160 (Gil. 123).

The defendant finally says that there is a want of equity in the bill, and discusses it from the standpoint of a bill for specific performance, which in fact complainant himself calls it. It is of little importance what name is given to a suit. If it appears that the complainant is entitled to equitable relief, that relief should be given to it, regardless of the name that is given to the bill. The facts show that the complainant at the death of Wirth was the owner of all the property left by him. It was the legal owner of all the title to which did not stand in Wirth, and as to that which Wirth had in his name it was the equitable owner. The suit seems to be one to enforce the equitable ownership rather than one to compel specific performance.

A decree will be entered dismissing the cross-bill. As to the property not in the possession of or under the control of the administrator a decree will be entered substantially as prayed for in the bill. As to the property which is in the possession of the administrator other questions arise. Such property being in the possession of the administrator is in the possession of the probate court of Minnesota, and this court cannot interfere with the possession of that court. See cases cited in Pulver v. Leonard (C. C.) 176 Fed. 586–589; Waterman v. Canal-Louisiana Bank Co., 215 U. S. 33, 46, 30 Sup. Ct. 10, 13, 54 L. Ed. ——. In the case last cited it was said:

"The United States Circuit Court, by granting this relief, need not interfere with the ordinary settlement of the estate, the payment of the debts and special legacies, and the determination of the accounts of funds in the hands of the executor, but it may, and we think has the right to, determine as between the parties before the court the interest of the complainant in the alleged lapsed legacy and residuary estate, because of the facts presented in the bill. The decree to be granted cannot interfere with the possession of the estate in the hands of the executor while being administered in the probate court, but it will be binding upon the executor, and may be enforced against it personally. If the federal court finds that the complainant is entitled to the alleged lapsed legacy and the residue of the estate, while it cannot interfere with the probate court in determining the amount of the residue arising from the settlement of the estate in the court of probate, the decree can find the amount of the residue, as determined by the administration in the probate court in the hands of the executor, to belong to the complainant, and to be held in trust for her, thus binding the executor personally, as was the case in Payne v. Hook, 7 Wall. 425 [19 L. Ed. 260], and Ingersoll v. Coram, 211 U. S. 335 [29 Sup. Ct. 92, 53 L. Ed. 208], supra. It is to be presumed that the probate court will respect any adjudication which might be made in settling the rights of parties in this suit in the federal court. It has been frequently held in this court that a judgment of a federal court awarding property or rights, when set up in a state court, if its effect is denied, presents a claim of federal right which may be protected in this court."

A decree will therefore be entered declaring that the Order of St. Benedict of New Jersey is the sole owner of the amount of the residue of the property, as determined by the administration in the probate

court, in the hands of the administrator, and declaring that such residue be held in trust for the complainant.

The decree will also provide that when such residue is discharged from all claims of administration, and is ready for distribution to the persons thereto legally entitled, the administrator pay it to the complainant.

The decree will also enjoin the administrator from paying such residue to any of the heirs, or to any person other than the complainant.

Costs will be allowed to the complainant.